### HOWARD v. LOVETT.

1. TRADE-NAMES—THEATERS—UNFAIR COMPETITION—INJUNCTION—EVIDENCE.

 On a bill to enjoin the use of the alleged trade-name "Mercedes" by defendants, a rival vaudeville company, in an act produced by them, one of the defendants, a woman, and who bore such name, having been formerly a member of plaintiff's company, evidence *held*, to show that the word "Mercedes" was used to designate the actress in plaintiff's production and not as the name of the act.[1] STONE and BIRD, JJ., dissenting.

2. INJUNCTION—EQUITY—DISCRETION OF COURT.

 The writ of injunction is not a writ of right, but its issuance rests in sound discretion, and such discretion should not be moved where the party applying does not bring his case within equitable principles, does not show superior equities that are entitled to protection at the hands of a court of equity, and does not make such a case as moves the conscience of the court to grant the relief.

[1]On right of members of organization to protection in use of name which their efforts have made valuable, see note in 28 L. R. A. (N. S.) 458.

 On limitation of right to use one's own name as a trade-name, see notes in 1 L. R. A. (N. S.) 660; 28 L. R. A. (N. S.) 934; L. R. A. 1916C, 255.

Appeal from Wayne; Perkins, J., presiding. Submitted June 15, 1917. (Docket No. 58.) Decided December 27, 1917.

Bill by Joseph B. Howard against George Lovett, Elizabeth M. Crane and others to enjoin the use of a trade-name. Defendant filed a cross-bill to establish her right to said name. From a decree for plaintiff, defendant Crane appeals. Reversed, and bill and cross-bill dismissed.

*George W. Bates* (*Leo M. Butzel* and *Charles A. Wagner,* of counsel), for plaintiff.

*Angell, Bodman & Turner,* for appellant.

FELLOWS, J. I do not agree with Mr. Justice STONE in his conclusion in this case. Plaintiff's name by birth was Joseph Cohen; when only a youngster, he appropriated to himself the name of Joseph B. Howard, one Joseph Howard being somewhat prominent in the theatrical world; later plaintiff, by certain proceedings taken in the courts at Chicago, caused his name to be changed to Joseph Mercedes. Defendant had always been called by her family and friends Mercedes, or an abbreviation thereof, and was so known and called by plaintiff. I am convinced from this record that the performance here involved, and which is only a clever trick by its producers, was gotten up by the joint efforts of plaintiff, defendant, and defendant's father. I do not place credence in all the testimony of either of the parties, and feel that we should look beyond the oral proofs to documentary evidence, which may be corroborative of the claims asserted. The plaintiff admits that the act is not original with him, or original with the present generation; that he got the idea from a book on magic; that it probably appeared in books before he was born. Upon his cross-examination a book was submitted to him,

and on examination of it he admitted that it contained the idea of this trick. He was asked to turn to the fly leaf, and there appeared "J. M. Crane," who he admitted was the father of defendant. Mr. Crane was a newspaper man on a prominent Chicago paper; had been dead for some time. In view of the fact that plaintiff's testimony is not consistent with defendant's, or with itself, I am inclined from this circumstance to give credence to the idea of joint action by these three people in getting up this act.

I am not strongly impressed by the testimony of the witness who said that she "was a palmist at one time, and sang," and who testifies that in 1908, in the winter time, plaintiff called at her house three or four times to get her to work for him in this mind-reading act, and told her that he was going to call the act "Mercedes." She admits that she could not play the piano, which was an absolute essential to the act, while in an affidavit, sworn to by her and filed with the bill of complaint for the purpose of obtaining a temporary injunction, she fixes the conversation in the year 1909, in the summer time. In this affidavit she gives as the reason she did not enter the employ of plaintiff, not the fact that she could not play the piano, but that they "were unable to agree upon proper terms."

The testimony of another witness, much relied upon by plaintiff, that shortly before Labor Day, 1910, he saw a banner at plaintiff's "Temple of Knowledge" upon which was painted two women, one named "Mercedes" and the other "Vera," is not of probative force of plaintiff's claim. It is the claim of defendant that arrangements had been made some time before that for the production of the act, and, while plaintiff insists he did not know the defendant by any other name than Miss Crane, and did not know her given name, a letter was shown him on cross-examination, which he admits having written, addressing her as "Dear

Friend Merc." The letter was written in the spring of 1910, several months before the banner was painted. Under these circumstances, this painted banner is as consistent with defendant's claim as it is with plaintiff's.

When these parties produced the act, the advertising used and which appears in the record as exhibits, convinces me that the name "Mercedes" was not used as the name of the act, but of the actress. I quote from one of these exhibits:

MR. JOSEPH B. HOWARD
OFFERS
The Bewildering Sensation of the Hour
"MERCEDES"
The Psychic Wonder
Call Your Name!
SHE WILL   Read Your Mind!
Answer Your Questions!

The parties continued together until defendant was forced by plaintiff's conduct towards her to sever relations with him, when she telegraphed her father for money and returned to Chicago. Thereafter, when defendant appeared on the stage, she appeared under the name of "Mercedes," although plaintiff claims his attorney prevented her from giving this performance.

I cannot reach the conclusion from plaintiff's advertising matter found in this record that the act was called "Mercedes." It was the actor, not the act. I quote three of these advertising bills offered by plaintiff to substantiate his claim. The first one at the Lyric Theater:

Mr. Joseph B. Howard presents
The Bewildering Sensation of the Hour
"MERCEDES"
Startling Sensational Mind Reader
LA PIANISTE DE MYSTERIE
Presenting an Act that Amazed and
Mystified the Entire World.

The second one, at the Garrick Theater, reads:

The Season's Greatest Sensation
"MERCEDES"
The Psychic Wonder
She Will Tell Your Name
Read Your Mind—Answer Your Questions.

The third one, at Keith's Theater, in Boston, is as follows:

"MERCEDES"
Accompanied by the Marvelous Mystic, Mlle. Stantone, in Their Unparalleled Occult Revelation
THE MUSICAL ENIGMA
Mercedes Transfers in Silence by Telepathic Waves to Mlle. Stantone Any Musical Selection Suggested by the Audience.
MOST EXTRAORDINARY POWER POSSESSED BY MAN.

I am convinced that the claim now asserted by plaintiff that "Mercedes" was the name of the act performed by him is an afterthought on his part, and that "Mercedes" was used to designate the performer, instead of the act performed.

But there is another feature of this case which I think should work its reversal. It is said that plaintiff has built up a valuable business in giving this performance, which should be protected by a court of equity. I realize that a certain degree of latitude is allowed in praising one's wares; but there is a limit to all things. The methods used by this plaintiff to establish his reputation and build up his business were not such, to my mind, as appeal to the conscience of a court of equity for relief through that court by the strong arm of a writ of injunction. We may lay aside the fact that the performance sought to be protected is a trick pure and simple, that the so-called "thought transfusion," "mind reading," or "psychic wonder," is simply the carrying out of a carefully devised code, understood alone by the performers; that, while it

amuses and interests, it at the same time deceives the public. All these may be laid aside while we examine the methods used by the plaintiff to establish his reputation. I quote from one of his press notices, published after he had appropriated to himself the name "Mercedes":

### Mercedes' Life Story.

The life of Mercedes reads like a page from a book of fiction, teems with adventure, and is colored with real romance. Mercedes is, of course, a *nom de theatre*. It was chosen by the young man, who is mystifying the world with his peculiar demonstrations of telepathy, because it was the name of his mother, a Spanish lady. In reality Mercedes' name is Joseph Howard. His father, a Scotchman, wedded to a Spaniard, met reverses which necessitated the son seeking employment at a very early age. They lived in Chicago, and young Joe, or Mercedes, as you shall call him hereafter, found work in a factory. It was hard grinding toil and the boy's only relief—for he had the temperament and soul of an artist—was found at night-time, when he resorted to his room or to the homes of his friends and the companionship of his beloved violin. Near neighbor to him lived Nellie Stantone, whose parents were French. She and Mercedes were playmates from childhood and when the young man played his violin it was Nellie Stantone who thrummed out his accompaniments on the piano.

One day while at work in the Chicago factory Mercedes' third finger on the left hand was caught in a machine and smashed to a pulp. Blood poison set in and the boy's life was despaired of. For weeks he raved in delirium, but when convalescence came he sought the home of his girl friend, and as he lay, frail and sad, upon a couch, while she sat at the piano, the inspiring notes of his favorite violin solo rang through his thoughts. For weeks in his fever-tortured agony, this last piece he had played upon his violin was constantly with him. Hardly realizing what he was saying on his first day out, he turned to Miss Stantone, and said: "Nellie, I wish you would play that piece for me. It's haunted me."

Years of Very Hard Study.

The girl whirled around on her piano stool instantly and began to play Gounod's "Ave Marie." Mercedes was startled, for he had not mentioned the name of the selection. They were both children, and, had the boy failed to mention the incident to his father, it probably would have been forgotten, and what is now regarded as a scientific revelation might have been lost to the world. Mercedes' father was a great reader. He had heard a lot about telepathy and so he insisted that there should be a trial of the boy's powers. After much practice Mercedes and Miss Stantone brought their experiments to a successful conclusion. Mercedes thought of a selection he wished her to play and she played it without having any communication by word or sign from her violinist friend. This practice was kept up incessantly in spite of opposition from the young woman's family, for they believed that young Mercedes possessed some evil power over their daughter and they at length forbade the boy and the girl to meet. They did meet clandestinely, however, and tried out their skill in divers ways. At length the girl's family discovered these secret meetings, and, to rid of the incubus of the boy's evil influence, as they termed it, packed up their chattels and removed to Battle Creek, Mich. Mercedes' father, too, tired of the young man's persistence and gave him a sound thrashing one day that seems to have been the turning point in Mercedes' life. He ran away from home, went to Battle Creek, and sold newspapers on the streets for a living. He suffered a serious illness, was taken home, and, upon his recovery, his family being advised to allow him to pursue his bent, he was now unmolested in the pursuit of the secret of telepathy.

There were years of study, and finally, three years ago in Chicago, a public performance which made everybody talk of the strange occult influence of this boy over the girl at the piano. Since then Paris and London and the entire continent of Europe have been startled by the strange performances of this boy and girl, and now America is sitting up and taking notice of the strange things they are accomplishing.

Admittedly there is not one statement in this entire

article that is true, or that even approximates the truth. To put our approval upon such methods, by protecting with a writ of injunction a business built upon such a foundation, would, to my mind, disregard that maxim of equity that is hoary with age—that he who comes into a court of equity must come with clean hands. The writ of injunction is not a writ of right, but its issuance rests in sound judicial discretion; that discretion should not be moved where the party applying does not bring his case within equitable principles, does not show superior equities that are entitled to protection at the hands of a court of equity, does not make such a case as moves the conscience of the court to grant the relief.

I am persuaded that neither of these parties has shown such a clear right to the exclusive use of the name "Mercedes," in connection with this performance, as would justify this court in enjoining either, as against the other, from continuing to entertain, amuse, and deceive the public by it.

I think both the bill and cross-bill should be dismissed, with costs to the defendant.

KUHN, C. J., and MOORE, STEERE, and BROOKE, JJ., concurred with FELLOWS, J. OSTRANDER, J., concurred in the result, dismissing the bill.

STONE, J. (*dissenting*). This case is in this court on the appeal of the defendant Elizabeth M. Crane from a decree entered in the court below in favor of the plaintiff. There is some confusion in the statement of facts by counsel, due to the statement of those facts only which are favorable to their position, and the omission of those relied upon by the other party. The learned circuit judge, who heard the case and who saw and heard the witnesses testify, filed a written opinion, which is sustained by the record. It states the claims of the parties and the questions involved so

clearly that a portion of it is quoted as a statement of the case:

"The plaintiff claims that he is entitled to the exclusive use of the word 'Mercedes,' in connection with the production of a certain vaudeville play, which he claims he has been producing for the last five years and upwards; that he originated the word 'Mercedes,' in connection with this act, and applied it to the act, and has continued to apply it to the act during those years; that the act has been very successful, and is now producing a large income for himself and those associated with him; that the act is well known, and is produced only at the best vaudeville theaters in this country as a headliner, so-called.

"The defendants claim that the word 'Mercedes' is Miss Crane's middle name; that her name is Elizabeth Mercedes Crane; that she became associated with the defendant Lovett something less than a year ago in the production of a play or act similar to the production of the plaintiff's, but which varied somewhat by some additional features which have been added to the act; that her part in the production is substantially the same now, under the direction of Mr. Lovett, as when she was associated with the plaintiff in 1910. She claims that she was the essential feature of the act as produced by the plaintiff, when he produced this particular play in 1910. She claims that she was instrumental in originating it, that her father had more or less to do with the origin of this particular act, and that when she and the plaintiff began producing it they were partners, she receiving one-half of the net proceeds of their joint venture; that for some time the plaintiff and the defendant Crane continued to produce this act, until finally disagreements arose which separated them; she returning to her home in Chicago, and obtaining employment elsewhere.

"The plaintiff denies that there was any partnership between the parties, in this: That the act was exclusively his idea, that he employed the defendant Crane to assist him in the production of the act, and that that is as far as she had any connection with it. After the separation of the parties, the plaintiff employed another lady to take Miss Crane's part, and from that time on, the act itself, not the performer, was called

'Mercedes,' and the word 'Mercedes' has been applied to the act itself from that time on, and until this day.

"It seems, from the testimony of the defendants, that the defendant Lovett conceived the idea of putting on a similar act, as I have said, a year ago; that he employed Miss Crane to assist him in producing the act, which is, in substance, the same act, in its essential features, as the act of the plaintiff; that a trial performance, or a series of performances, was given in Chicago, later in Davenport, then in Winnipeg, and still later in Cincinnati. The advertisements that were used in Cincinnati are before the court. At first the act was called 'Concentration,' but the advertisements in Cincinnati show that emphasis is given to the word 'Mercedes,' in connection with the name 'Crane.' Advertisements of the defendants' performance, that were distributed in Detroit recently, also give emphasis to the word 'Mercedes,' which is the feature word of the advertisement. The word 'Crane' is placed in small letters in all of these later advertisements, and it is because the plaintiff claims that the defendants are unduly using the word 'Mercedes,' thereby taking away from him that which he claims is his own, that this proceeding is instituted, and the plaintiff claims that the defendants should be restrained absolutely from using the name 'Mercedes' in connection with their production.

"The defendants, on the other hand, claim that, because the name 'Mercedes' is the middle name of Miss Crane, she has a right to use it in connection with the production of the defendants, and because of the further right, which was hers, and which she never abandoned, while she was associated with the plaintiff, when her middle name was used in connection with the plaintiff's production at that time. And the defendants pray that the plaintiff be restrained from the use of the name 'Mercedes,' and that he be required to account for the profits that he has made. Both sides ask, in other words, for a permanent restraining order, each against the other, and for an account of the profits each may have made out of the use of the word 'Mercedes.'

(Counsel for plaintiff here announced that they did not ask for an accounting.)

"I think I have sufficiently stated the substance of the pleadings and claims, so that the real issue involved may appear clearly to all of us. This is as to whether the plaintiff may exclusively use this word 'Mercedes' in connection with his vaudeville production. It was conceded by both sides at the beginning of the hearing that that was substantially the issue to be determined by the court. There is no complaint against the defendants by the plaintiff that, in the production of this particular vaudeville act by them, they may use the word 'Concentration,' or any other word they may choose to select. It is the use by the defendants of the word 'Mercedes' that must be determined. I think it appears beyond question that the word 'Mercedes,' in connection with this particular vaudeville act, has become a valuable asset to the plaintiff, and would be a valuable asset to the defendants, if they could appropriate it and use it. The fact that it is a valuable asset is the fact which leads both parties into a court of equity to restrain the other from its use.

"The principal contention of the defendants that the word 'Mercedes' is a part of Miss Crane's name, and therefore they have an exclusive right to use it, is not controlling by any means. A name may be used without question, if the use of it does not infringe upon the rights of another, in the prosecution of his business, whereby the public is likely to be misled, as has been said by counsel.

"This question of the right to use names in connection with one's own business—particular names, proper names, common names, any name—has been before the courts a number of times, in this and other States. It seems to me that the question involved here has been determined by the decisions of our own court, and it is not necessary to go outside of Michigan to find the law fully and completely stated. The case of *Lamb Knit Goods Co.* v. *Lamb Glove & Mitten Co.*, 120 Mich. 159 (78 N. W. 1072, 44 L. R. A. 841), is a case where the use of a proper name was enjoined, under the circumstances shown there, because its use by the latter concern, in the judgment of the court, would lead to confusion; the public would be misled in dealing with the two institutions, and would be unable to determine, by the use of that name, which of the two

they were really dealing with. In a case that arose in this city, I think (*Penberthy Injector Co.* v. *Lee*, 120 Mich. 174 [78 N. W. 1074]), a similar question arose, and the use of the word 'Penberthy' was enjoined.

(The court then referred to *Michigan Savings Bank* v. *Dime Savings Bank*, 162 Mich. 297 [127 N. W. 364, 139 Am. St. Rep. 558.])

"It seems to me that the law is so well settled along this line that it is hardly worth while to discuss it, or to argue it. The books are full of cases in which parties have been restrained from using their own names, in a way to appropriate the good will of a business already established by others under that particular name, and that is this case exactly. Assuming all that the defendants claim to be true, still it appears undisputed that, from 1910 down to the present time plaintiff has used the name 'Mercedes' in connection with this particular production, and that it has been during these five years that the name has achieved its notoriety, its importance, its association with the act itself —its popularity, its money-making qualities. It also appears that within the past eight months the defendant Lovett, in connection with Miss Crane, who was formerly associated with the plaintiff, produced a similar act, and used Miss Crane's middle name, which happens to be 'Mercedes,' as featuring principally the act.

"It does not make any difference whether up to 1910, while Miss Crane was associated with the plaintiff, she was called 'Mercedes,' and designated as 'Mercedes' upon the advertisements of the plaintiff, or not. She claims that is the fact. The plaintiff claims that the word 'Mercedes' was used to designate the act, but that is not very material. The fact is that for five years the act itself has been described as 'Mercedes,' and that it has gained its popularity, its popular favor as an act, known as 'Mercedes,' and, as I have said, during the last year the defendants have been using this word, and I think unlawfully.   *   *   *

"An injunction, plain, simple, and in few words, will be issued, restraining the defendants, and each of them, from further use of the word 'Mercedes' in connection with their production."

198—Mich.—46.

The decree adjudged that the plaintiff, since the 10th day of August, 1910, had been, and then was,

"the sole and exclusive owner of the trade-mark and trade-name of 'Mercedes,' as applied to that alleged psychic performance of thought transference as performed by the said Joseph B. Howard, which consists of a woman, blindfolded, playing upon the piano on the stage such musical selections as may have been communicated to her by alleged thought transference through the agency of the said Joseph B. Howard, which said selections of music were made by some person in the audience, and, after having informed the said Joseph B. Howard of such selections, such persons then ask the blindfolded woman, at the piano, to play such selections, who thereupon plays the same."

It adjudged that the defendants had no right therein or title thereto, but had unlawfully infringed upon the rights and property of the plaintiff therein. It enjoined and restrained the defendants from using the name "Mercedes," or any combination thereof, in relation to the said psychic performance as stated, and from giving any public or private performance of the same under said name "Mercedes," and from giving any such performance under the name "Concentration," in connection with or under the name "Mercedes," and from using the name "Elizabeth Mercedes Crane" in connection with the name "Concentration" as applied to such performance, either wholly or in part, and from advertising or making any public performance thereof, under the name "Mercedes," or that of "Concentration," in connection with the name "Elizabeth Mercedes Crane," or that of "Mercedes Crane," either wholly or in part, or in any other combination of names containing the word "Mercedes," or that of "Concentration," as so applied, or any variation thereof whatsoever, and that the defendants, and each of them, do henceforth refrain from using said word "Mercedes," or that of "Concentration," in con-

nection with the name "Elizabeth Mercedes Crane," either wholly or in part, in any signs, advertisements, labels, cards, letter heads, or other ways whatsoever, or in any manner calculated or tending to infringe upon plaintiff's exclusive title aforesaid. The cross-bill of defendants was dismissed.

Upon the argument of this case I was in doubt whether the evidence warranted the finding and decree below. A careful review of the evidence and examination of the exhibits have satisfied me that the trial court reached the correct conclusion. There is an irreconcilable conflict in the evidence, especially in that of the plaintiff and the defendant Crane. It is the claim of the plaintiff that as early as 1908, while he was conducting a performance in which the girl on the stage identified articles handed him by persons in the audience, he conceived the idea of a musical transference act like the one in question. His testimony on this point is corroborated by that of two other witnesses. It is undisputed that he then spoke of calling the pianist in the act "Mercedes;" that he adopted the name from that of the betrothed wife of the Count of Monte Cristo, of which he had read. Applying the rule suggested by appellant's counsel that "trade-names are acquired by adoption and user, and belong to the one who first used them and gave them a value" (38 Cyc. p. 765), we think that it appears that plaintiff originated the name and first used it in connection with the act in question. It is true that he did not use it until the year 1910, when he employed Miss Crane as pianist. We do not think that any partnership existed, and it does appear that he paid Miss Crane wages, and continued to use the name in connection with the act, after Miss Crane left his employment; and he continued to use it down to the time of the hearing in the court below. In our opinion it is not significant or important that Miss Crane's middle name is Mercedes,

nor that she was addressed as "Mercedes," or "Merce," or "Merc," by her friends, instead of "Elizabeth." Nor do we think it important or controlling that Miss Crane used the name "Mercedes" in another and different act after she left the employment of the plaintiff, as appears by her exhibits on pages 170 and 171 of the record.

We are of the opinion that it appears that the plaintiff has rightfully been using this name in connection with and to advertise this act since 1911, and has given the act its present standing before the public, and that he should therefore be protected in its exclusive use. In addition to the cases cited by the circuit judge the following have a bearing upon the use of names: *Gordon Grate Co.* v. *Gordon*, 142 Mich. 488 (105 N. W. 1118) ; *Dayton* v. *Imperial Sales & Parts Co.*, 195 Mich. 397 (161 N. W. 958).

It is urged that the injunction is too broad. The court below enjoined the use of the name "Elizabeth Mercedes Crane," or any combination of that name with the word "Mercedes," in connection with this particular act, as described in the decree. Personally, Miss Crane can use her name as she sees fit, except that she cannot use it in connection with this act, or any similar act. If the injunction is to have any practical effect, it should stand as ordered. We are of the opinion that there was ample evidence to sustain the finding of the court below, and that the correct conclusion was reached.

The decree of the circuit court should be affirmed. The plaintiff should recover his costs of this court against the defendant Crane.

BIRD, J., concurred with STONE, J.