# Syllabus

Chief Justice:
Bridget M. McCormack

Chief Justice Pro Tem:
David F. Viviano

Justices:
Stephen J. Markman
Brian K. Zahra
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh

Reporter of Decisions:
Kathryn L. Loomis

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

THIEL v GOYINGS

Docket No. 156708. Argued on application for leave to appeal March 6, 2019. Decided July 24, 2019.

Matthew T. Thiel and Nikole M. Thiel brought an action in the Allegan Circuit Court against David L. Goyings and Helen M. Goyings, requesting that the court enjoin the Goyingses' construction of a home in the Timber Ridge Bay subdivision of Watson Township and order that the modular components of the home be removed or destroyed because the home violated the subdivision's restrictive covenants prohibiting the construction of modular homes. About a month after the suit was filed, William and Marcia Traywick joined as intervening plaintiffs. The Goyingses had selected Heritage Custom Builders, Cassidy Builders, Inc., and Ritz-Craft Corporation of Michigan, Inc., to design and build their home. Those builders specialized in systems-built homes constructed using a hybrid method of homebuilding that integrated modular components into on-site, stick-built construction. Through this method, part of the Goyingses' home was stick-built on-site, and three modular components were built off-site and delivered to the lot. In total, the completed home was to be composed of about 59% stick-built construction and 41% modular components. When the Goyingses' neighbors noticed delivery of modular components to the lot, Matthew Thiel and William Traywick contacted the Goyingses to inform them that installation of the modular home would violate the restrictive covenants and that they would take legal action. The Goyingses continued with the home's construction, and the modules were attached to a foundation of the same square footage as the assembled modules. The Thiels brought the instant lawsuit and moved for summary disposition, which the trial court denied. The case proceeded to a three-day bench trial, at which the court heard testimony from the parties and from a township building official, an appraiser, and the Goyingses' builder. The court, Margaret Zuzich Bakker, J., held that the restrictive covenants did not contemplate the type of hybrid home that the Goyingses had built and that the home was "sufficiently constructed, valued, and congenial as to allow it to remain." Plaintiffs appealed. In an unpublished per curiam opinion issued on August 8, 2017 (Docket No. 333000), the Court of Appeals, HOEKSTRA, P.J., and MURPHY and K. F. KELLY, JJ., reversed, holding that the restrictive covenants were unambiguous and that the Goyingses' home was in clear violation of those covenants. The Goyingses sought leave to appeal in the Supreme Court, and the Supreme Court ordered and heard oral argument on whether to grant the application or take other action. 501 Mich 1030 (2018).

In an opinion by Chief Justice MCCORMACK, joined by Justices VIVIANO, BERNSTEIN, CLEMENT, and CAVANAGH, the Supreme Court, in lieu of granting leave to appeal, *held*:

Courts review restrictive covenants with a special focus on determining the restrictor's intent. Unambiguous restrictions must be enforced as written, but any uncertainty or doubt must be resolved in favor of the free use of property. In this case, the dispute was not about the definition of the word "modular"; rather, the dispute concerned how the subdivision's restrictive covenants defined a "modular home." The restrictive covenants stated, "All residences shall be stick built on site and no . . . modular home . . . will be erected on any of the Parcels unless provided for herein." A fair reading of a modifier like "modular" applies its meaning to the noun as a whole. The limiting factor is the extent to which the noun accepts the modifier. A homogenous or abstract thing often accepts the modifier wholly (a blue circle, a truthful statement); most things that exist in the real world have some degree of heterogeneity and fully accept modifiers within the bounds of reason (a red car, a friendly neighbor). And houses, like cars or people, are not just one thing. Accordingly, the most natural reading of the phrase "modular home" is a home that is mostly or generally modular. That is, a home is a modular home under the restrictive covenants if it is predominantly modular—more modular than not. If the phrase "pre-fabricated or modular home" were interpreted to include any home constructed using a modular or prefabricated component, that interpretation would render the covenant provision unenforceable because every home doubtless contains some prefabricated part. Additionally, reading the phrase "modular home" in the context of the other terms revealed that a modular home is of a kind with prefabricated homes, geodesic domes, berm-houses, mobile homes, shacks, and barns. The covenants' use of different terms also suggested an important difference between a permissible home and a prohibited one in how it comes to be built. The covenants' use of verbs like "move," "place," or "locate" suggested picking up something that already exists and plunking it down on the lot, fully formed. And a difference exists between structures that are constructed versus erected: to construct a structure evokes forming or creating that structure by putting together its parts, whereas to erect a structure connotes assembling or raising it. In this case, the Goyingses' home was not a relocated residence because each modular component was merely a raw piece of construction material delivered to the lot, and the Goyingses' home was also not a manufactured housing unit because the common understanding of that term is a mobile home. The materials, workmanship, quality, and outward appearance of the Goyingses' home were indistinguishable from a site-built home. The language of the restrictive covenants supported the trial court's finding that there is a distinction between a modular or prefabricated home and a site-built home with modular or prefabricated components. Therefore, applying the covenants to the undisputed facts found by the trial court, the Goyingses' home was not a "pre-fabricated or modular home" as the restrictive covenants use that phrase because the Goyingses' home was mainly stick-built with modular components integrated into it. The Court of Appeals erred when it implicitly held that the restrictive covenants prohibited any home that contained a module.

Court of Appeals opinion reversed; trial court decision reinstated.

Justice VIVIANO, joined by Chief Justice MCCORMACK, concurring, agreed in full with the majority's opinion but wrote separately to explain that an alternate basis for reversal would be the Court of Appeals' erroneous conclusion that the only solution was to grant injunctive relief and order that the home be removed. The Court of Appeals based this conclusion on a case

decided over 60 years ago, *Cooper v Kovan*, 349 Mich 520 (1957). *Cooper* merely recognized that the trial court in that case went too far in an effort to craft an equitable remedy, substituting its own judgment for that of the parties; *Cooper* did not divest trial courts of their equitable discretion to determine whether an injunction is the proper form of relief in light of all the facts, nor did *Cooper* bar consideration of all equitable defenses apart from the three expressly mentioned. However, the Court of Appeals erroneously interpreted *Cooper* as establishing a per se rule that absent three specific circumstances, a trial court must enforce by injunction a valid restrictive covenant. Justice VIVIANO concludes that this reading of *Cooper* conflicts with caselaw prior to *Cooper* and with general principles of equity and that the Supreme Court should, in an appropriate future case, clarify that *Cooper* did not abrogate the rule long recognized by the Supreme Court that the enforcement of a restrictive covenant is a matter of the trial court's discretion.

Justice MARKMAN, joined by Justice ZAHRA, dissenting, would have held that the Court of Appeals correctly determined that the Goyingses' home was a modular home and that the home violated the subdivision's restrictive covenant prohibiting the erection of modular homes. A review of the common and ordinary understandings of what comprises a modular home—and in particular the unanimous characterizations of professionals who were familiar with such homes—compelled the conclusion that the Goyingses erected a modular home in contravention of the restrictive covenant. The covenant specified that "no . . . modular home . . . be erected on any of the Parcels . . . ." Using dictionary definitions, the covenant proscribed the "fitting together of materials or parts" to create a "place of residence" that is "constructed using standardized units." In characterizing whether a home is modular, a litany of factors, each of which may be relevant, or even sometimes determinative, must be considered, including the proportion of the home that is comprised of modular units, the nature of the modular units, and the overall relationship of the modular units to the structure itself. In this case, three modular units were manufactured in a factory; these modular units were enclosed, freestanding structures that were identified as entire and discrete rooms adorned with doors, windows, cabinets, countertops, mirrors, and lighting and plumbing fixtures. And the modules were of such size and substantiality that there could be no home without them. Thus, the home comported with the plain and ordinary understanding of what comprises a modular home, regardless of whether it achieved the majority's own standard of "predominance." Moreover, the professional characterizations supported this understanding of modularity. Every professional source, beginning with the building contracts and ending with the inspections and evaluations, characterized the home as modular: the company with which the Goyingses contracted for site improvements described the home as modular in its contract, the building-permit application described the property as modular, the building permit gave the Goyingses permission to install a modular home, the uniform residential appraisal report prepared by an appraisal company stated that the home was modular, a building system approval report from the Michigan Department of Licensing and Regulatory Affairs classified the home as modular, the manufacturer of the home described itself as a modular home manufacturer, a company that assisted with the erection of the home described it as modular, another company involved in the design process repeatedly referred to the home as modular, a township building official testified that there was "no doubt" that the home was modular, and another appraiser who was qualified as an expert witness in the area of residential real estate appraisals testified that the home was modular. These characterizations should have been given considerable weight in determining whether the home was modular. Finally, with regard to the appropriate remedy for violation of the covenant,

Justice MARKMAN agreed with the Court of Appeals that removal of the home was appropriate. When parties have freely established their mutual rights and obligations through the formation of unambiguous contracts, the law requires that courts enforce the terms and conditions contained in such contracts. The Goyingses knowingly violated the covenant by erecting a modular home, and because the home could not be made nonmodular absent its removal, the only effective remedy was the removal or dismantling of the home.

©2019 State of Michigan

# OPINION

Chief Justice:
   Bridget M. McCormack

Chief Justice Pro Tem:
   David F. Viviano

Justices:
Stephen J. Markman
Brian K. Zahra
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh

FILED July 24, 2019

STATE OF MICHIGAN

SUPREME COURT

MATTHEW T. THIEL and NIKOLE M.
THIEL,

        Plaintiffs/Counterdefendants-
        Appellees,

and

WILLIAM TRAYWICK and MARCIA
TRAYWICK,

        Intervening Plaintiffs/
        Counterdefendants-Appellees,

v                                   No. 156708

DAVID L. GOYINGS and HELEN M.
GOYINGS,

        Defendants/Counterplaintiffs-
        Appellants.

BEFORE THE ENTIRE BENCH

McCORMACK, C.J.

David and Helen Goyings designed and built a retirement home on a lakefront lot. Their neighbors insist that the Goyingses violated the subdivision's restrictive covenants that bar "pre-fabricated or modular home[s]" (along with mobile homes, berm-houses, geodesic domes, shacks, and barns) and that they must tear it down.

After a three-day bench trial, the trial court found no cause of action and dismissed the case. But the Court of Appeals concluded that the trial court erred when it held that the covenants "did not contemplate a home of the type built by Defendants." The Court of Appeals reasoned that the Goyingses' home unambiguously fit the commonly understood definition of "modular" but never construed the disputed term used in the covenants— "modular home." The panel reversed and held that the trial court should have granted judgment in the neighbors' favor and ordered the Goyingses to tear down their new home.

We disagree. We reverse the Court of Appeals and affirm the trial court's dismissal of the case.

## I. FACTS AND PROCEDURAL HISTORY

Timber Ridge Bay is a subdivision on the shores of Big Lake in Allegan County. Fourteen of the sixteen residential parcels within the subdivision are subject to Timber Ridge Bay's "Declaration of Restrictions, Covenants and Conditions," which was drafted by the developer and recorded with the county register of deeds in December 2006. At the time of trial, four homes had been built in the subdivision that were subject to these deed restrictions, covenants, and conditions.[1] Three of those belong to the Thiels, the

---

[1] There is also a fifth home located on the two parcels not subject to the restrictive covenants.

2

Traywicks, and the Goyingses, respectively. The fourth homeowner has not joined in this litigation.

As relevant here, the covenants provide:

**COVENANTS, RESTRICTIONS AND CONDITIONS**

Section 1. <u>Establishment of Restrictions.</u> In order to provide for congenial occupancy of the Premises, and for the protection of the value of the Parcels therein, the Parcels 1-14 shall be subject to the limitations set forth below:

\* \* \*

B. <u>Building and Use Restrictions.</u>

\* \* \*

3. <u>Relocated Residences</u>. No residences, including modular, manufactured, mobile or prefabricated homes, may be moved from a location outside the Premises and placed or located within a Parcel within the Premises.

4. <u>Manufactured Housing Units</u>. No manufactured homes, whether classified as a mobile home, modular home, or otherwise, and no prefabricated homes shall be permitted on any Parcel in the Premises, regardless of which building codes are applicable to said homes.

\* \* \*

C. <u>Residential Dwelling Restrictions</u>

\* \* \*

4. <u>Miscellaneous Provisions</u>. The height of any building will not be more than four (4) stories. If any portion of a level or floor within a residence is below grade, all of the level or floor shall be considered a basement level. All residences shall be stick built on site and no geodesic dome, berm house, pre-fabricated or modular home, mobile home, shack or barn will be erected on any of the Parcels unless provided for herein.

The third sentence of § 1.C.4 is the source of the plaintiffs' complaint: the plaintiffs contend that the defendants' home violates the prohibition against erecting a "pre-fabricated or modular home."

When the Goyingses built their new home on a lakefront lot, they selected Heritage Custom Builders, Cassidy Builders, Inc., and Ritz-Craft Corporation of Michigan, Inc., to design and custom-build it. These builders specialize in system-built homes constructed using a hybrid method of homebuilding that integrates modular components into traditional, on-site, stick-built construction. The Goyingses custom-designed their home (including the modular components) using a computer-aided design program. They also selected the interior colors and finishes for the carpet, flooring, backsplashes, and countertops.

The majority of the home would be stick-built on-site. This included the entire lower-level walkout basement, garage, roof gables, roofing, front porch, stone columns, deck, and other portions of the home. But three modular components would be built off-site and delivered to the lot. Together these components matched the dimensions of the foundation and would be delivered on trailers, lowered into place using cranes, and secured to the foundation. From there, the components—described at trial as "just . . . raw piece[s] of construction material"—would require on-site construction to be incorporated into the home and to make the home habitable. After delivery of the system-built components, the general contractor would go on to install a furnace, water heater, plumbing, drain lines, and duct work throughout the entire home and complete the on-site construction to incorporate the modular components. All told, the completed home would be composed of about 59% stick-built construction and 41% modular components.

4

The Goyingses began to build. They dug the basement, poured the foundation, and began on-site construction of the lower level. But the neighbors took notice when the Goyingses' custom-designed modular components (which were to make up the bulk of the ground-floor living space) arrived on trucks. That same day, the plaintiffs intervened— Mr. Thiel called the defendants to tell them that installation of the modular home on their parcel would violate the covenants. The Goyingses brushed off the objection, telling Mr. Thiel that a crane was scheduled to install the components the next morning and that they intended to move forward with construction. Mr. Traywick e-mailed the Goyingses to warn that the property owners would take legal action.

All the same, the crane arrived, and over the next two days it moved the modular components into place so that they could be incorporated into the site-built structure. The modules were attached to a foundation of the same square footage as the assembled modules. They completed the home construction with on-site stick-building to install plumbing, an electrical system, a furnace, shingles, a garage, gables, a porch, and a deck and finished the basement.

Plaintiffs Matthew and Nikole Thiel sued 10 days later, asking the Allegan Circuit Court to halt construction and order the modular components removed or destroyed. About a month after that, the Traywicks joined as intervening plaintiffs.

After the trial court denied the plaintiffs' combined motion for summary disposition, the case proceeded to a three-day bench trial. The court heard testimony from the Goyingses, the Traywicks, and the Thiels, as well as three other witnesses: a township building official, an appraiser, and the Goyingses' builder. The Court also received *de*

*bene esse* deposition testimony from the attorney who drafted the restrictive covenant in 2006, Zachary Bossenbroek.

The parties do not dispute any of the trial court's factual findings. The court determined that the "home meets all of the standards and specifications of a stick-built home." It found that systems-building was a hybrid method of construction similar to modular construction but ultimately determined that "systems built" homes and "modular" homes occupied discrete categories. It found that the testimony was uncontroverted that the overall quality of the Goyingses' home would equal or surpass that of homes that are stick-built on-site. The completed home would be indistinguishable from a stick-built home in material quality and workmanship because the modules were constructed out of the same materials as a stick-built home and the construction methods used in the factory were the same as those used to build a home on-site. The home was subject to the same residential building codes as a stick-built home. And the builder affixed the modules to the foundation just as it would a framed, stick-built home.

The court also found that the home's hybrid construction would not be visible. It would be visually attractive, and, from appearances, "it [would be] unlikely that anyone would know that the home had been built anywhere but on the property." The court also determined that although the plaintiffs believed "that knowledge that the construction of the home involved three modules would reduce the value of the other homes in the area," they did not present any evidence from an "appraiser, expert or other witness to support their belief."

Finally, on the basis of testimony from the plaintiffs and *de bene esse* deposition testimony from the covenants' drafter, the court determined that the purpose of the

6

covenants was to protect the value of the parcels by maintaining a consistent standard of aesthetics, quality, and value for all homes built within the subdivision. The covenants prohibited manufactured homes, mobile homes, and modular homes on the basis of the assumption that such homes " 'are not typically going to be of a standard and of esthetic [sic] appeal as what a stick built home would be . . . .' "

The trial court held that although the restrictions, covenants, and conditions in the deed might not seem to be ambiguous in their wording, the covenants did not contemplate a home like the Goyingses built, which does not fit neatly into either the modular or stick-built category. Therefore, the court concluded that, reading the covenants as a whole and resolving all doubts in favor of the free use of the property, the Goyingses' home conformed to the intent of the drafter. It held: "While an entirely modular, premanufactured or prefabricated home cannot be moved onto the properties located within Timber Ridge Bay, the home designed by [the Goyingses] is sufficiently constructed, valued, and congenial as to allow it to remain. A systems-built home of similar value, construction and congeniality shall be allowed on the Timber Ridge Bay properties."

The Court of Appeals reversed. The panel believed that the trial court incorrectly read an ambiguity into the covenant, reasoning that "the restrictive covenant was not rendered ambiguous for failure to specifically define 'modular.' " *Thiel v Goyings*, unpublished per curiam opinion of the Court of Appeals, issued August 8, 2017 (Docket No. 333000), p 6. The panel also concluded that the defendants' "tortured use of the term 'systems built' " did not require a different result because "the trial court correctly

7

concluded that the two terms [modular and systems-built] were synonymous."[2]  *Id*. at 4.  The panel held that "[t]he restriction should have been accorded its ordinary and generally understood or popular sense, without technical refinement."  *Id*.

And then the panel did just that.  It chose a dictionary definition of "modular": "**1.** of or pertaining to a module or a modulus.  **2.** composed of standardized units or sections for easy construction or flexible arrangement: *a modular home; a modular sofa. . . .*"  *The Random House Dictionary of the English Language: Second Unabridged Edition*.  But the panel then based its holding only on the isolated definition of "modular" without ever construing the relevant covenant term "modular home."  And given the definition of modular, the panel concluded that the "defendants' home was in clear violation of the unambiguous restrictive covenant . . . ."  *Thiel*, unpub op at 6.  The house had to come down.

The defendants sought leave to appeal in this Court.  We ordered oral argument on the application, directing the parties to file supplemental briefs addressing

> (1) whether the defendants' home is a "modular home" as defined by Timber Ridge Bay's "Declaration of Restrictions, Covenants and Conditions"; and (2) if so, whether the violation was a technical violation that did not cause substantial injury, *Cooper v Kovan*, 349 Mich 520, 530 (1957).  [*Thiel v Goyings*, 501 Mich 1030, 1030 (2018).]

---

[2] In fact, the trial court stopped just short of finding that the two terms were interchangeable.  It stated, "[T]he representative from the building contractor preferred the term 'systems built' to describe this particular construction, although it is clear that the term is similar to, if not synonymous with, modular."

## II. DISCUSSION

## A. LEGAL BACKGROUND

Negative covenants are grounded in contract. *Stuart v Chawney*, 454 Mich 200, 210; 560 NW2d 336 (1997). Therefore, the interpretation of restrictive covenants is a question of law that this Court reviews de novo. *Terrien v Zwit*, 467 Mich 56, 60-61; 648 NW2d 602 (2002). This means that we review the legal issue with fresh eyes, without any required deference to the courts below.

Courts review restrictive covenants with a special focus on determining the restrictor's intent. "[W]e are not so much concerned with the rules of syntax or the strict letter of the words used as we are in arriving at the intention of the restrictor, if that can be gathered from the entire language of the instrument." *Tabern v Gates*, 231 Mich 581, 583; 204 NW 698 (1925). We determine the intended meaning of the chosen language by reading the covenants "as a whole rather than from isolated words" and must construe the language "with reference to the present and prospective use of property . . . ." *Donnelly v Spitza*, 246 Mich 284, 286; 224 NW 396 (1929); see also *Seeley v Phi Sigma Delta House Corp*, 245 Mich 252, 253; 222 NW 180 (1928) ("The language employed in stating the restriction is to be taken in its ordinary and generally understood or popular sense, and is not to be subjected to technical refinement, nor the words torn from their association and their separate meanings sought in a lexicon."). And we enforce unambiguous restrictions as written. *Bloomfield Estates Improvement Ass'n, Inc v Birmingham*, 479 Mich 206, 214; 737 NW2d 670 (2007). Thus, we consider challenges to restrictive covenants in a contextualized, case-by-case manner.

It is a bedrock principle in our law that a landowner's bundle of rights includes the broad freedom to make legal use of her property. *O'Connor v Resort Custom Builders, Inc*, 459 Mich 335, 343; 591 NW2d 216 (1999). Restrictive covenants are at once in tension with and complementary to this right: deed restrictions allow landowners to preserve the neighborhood's character. And the failure to enforce the deed restriction thus deprives the would-be enforcer of a valuable property right. *Bloomfield Estates*, 479 Mich at 214. But enforcing a restriction beyond the restrictor's intent deprives the landowner of an even more fundamental property right—his right to legal use of his own property.

Weighty interests are at stake, but the balance tilts in favor of the right to control one's own land. Unambiguous covenants must, of course, be enforced as written, but any uncertainty or doubt must be resolved in favor of the free use of property. *Stuart*, 454 Mich at 210.

## B. THE RESTRICTIVE COENANTS

This is not a dispute about the definition of the word modular. On that point, we agree with the plaintiffs—there is a generally understood definition of modular, and it's a lot like the definition the Court of Appeals used. It's also not a dispute about whether modular homes are nice. The Goyingses' home certainly seems to be, but that's beside the point. This isn't a dispute about the facts at all—the parties do not challenge the trial court's factual findings. The dispute is about how the covenants define a *modular home*— that is, when does a home with modular components cross the line and become a modular home? How do we know a "modular home" when we see one?

10

## 1. THE TERM "PRE-FABRICATED OR MODULAR HOME" MUST BE DEFINED IN CONTEXT OF THE RESTRICTIVE COVENANTS

The record sets up a continuum between an entirely stick-built home on one side and an entirely modular one on the other. The trial court ruled that the covenants prohibited only *entirely* modular homes. The defendants suggest that the most natural reading prohibits a home that is *mostly* modular. The Court of Appeals didn't engage the question but concluded that the Goyingses' home was "in clear violation of the unambiguous restrictive covenant" even so. *Thiel*, unpub op at 6. And the plaintiffs have suggested that the defendants' home is modular by any definition or, when pressed, that a home is modular if its footprint is modular or if the "meat" of it is modular (and, they say, the defendants' home fits both definitions).

This interpretive dispute raises the question: how modular does a home need to be to be a modular home? But it is not a question to answer in the abstract; rather, its answer is grounded in the text of the covenants.

### a. TERMS OF THE COVENANTS

The restrictive covenants state, "All residences shall be stick built on site and no . . . modular home . . . will be erected on any of the Parcels unless provided for herein." The Court of Appeals concluded that "modular" means "**1.** of or pertaining to a module or a modulus. **2.** composed of standardized units or sections for easy construction or flexible arrangement: *a modular home; a modular sofa. . . .*" *The Random House Dictionary of the English Language: Second Unabridged Edition*. Every modern dictionary we consulted provides about the same definition. The trial court did not find that the term had a specialized meaning here. And although all homes are, to some extent, built with

standardized units for ease of construction—two-by-fours are all two inches by four inches; drywall sheets all come in standardized sizes—we also recognize that the parties have accepted that the "units" in this litigation are the three modules delivered by truck and lowered by crane. We assume for the sake of argument that those modular components, although custom-designed, were to some extent "standardized" for ease of construction. The definition of "modular" on its own is unambiguous.

But, of course, a modifier is just an abstraction until it acts on a noun—the question is when a *home* is *modular*. Stringing together bare definitions would mean that a "modular home" could be defined as "a dwelling that is composed of standardized units or sections for easy construction or flexible arrangement." This definition doesn't advance the ball much. Even though we agree on the meaning of "standardized units or sections," the definition begs the same question: how much of the home must be "*composed of*" these standardized units for it to be a modular home under the covenants? Or, again, how modular must a modular home be?

Grammar helps. When an adjective modifies a noun, we implicitly understand it to modify the whole noun. And what it means to modify the whole noun depends on the noun. So an "orange trapezoid" probably describes a solid-colored geometric shape. A "mean, orange cat" describes a grumpy feline with orange fur, no matter that its eyes might be white and its paws might be black, because we understand that cats are not often monochromatic.[3] If we want to modify less than the whole noun, or express the

---

[3] And of course this understanding requires that we are comparing traits along a single dimension—apples to apples. Thus, the dissent's counterexamples don't work: a blueberry muffin refers to the flavor of the muffin (more blueberries than cranberries, for instance). A sugary drink is more sugary than savory.

modification in finer detail, we might employ an adverb to modify the adjective—a bright orange cat, or a partly orange cat.

In the same way, the most natural reading of the phrase "modular home" is a home that is mostly or generally modular.[4]  And because we understand that a "home," like a cat, is a heterogeneous object, a mobile home would still be a mobile home under these covenants even if it had a custom-built, handcrafted porch.  It takes more than standardized roof trusses to make a prefabricated house.  A brick house needn't have a brick roof.  And so on.

Courts seek to find a fair reading of contract language—not a strict one—because strict constructionism destabilizes the whole enterprise of contract law.  Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* (St. Paul: Thomson/West, 2012), pp 39-41 and 355-358.   Brittle, hyperliteral interpretations make agreements fragile and impractical.  These covenants show why: if we interpreted "pre-fabricated or modular home" to include any home constructed using a modular or prefabricated component, we would render the covenant provision unenforceable.  Every home in the neighborhood doubtless contains some prefabricated part—the Traywicks have a prefabricated basement wall system, and, as the circuit court found, any modern home is constructed using prefabricated components like "trusses, foundation, cabinets, etc."  Courts do not enforce

---

[4] The dissent criticizes this standard as contravening the covenants, but we fail to see how. A home that is more modular than not is reasonably characterized as "modular," while a home that is less modular than not is, conversely, reasonably characterized as *not* modular. We would have a different case if the covenants used different language.  But we seek a fair reading of the language the drafter used; we cannot rewrite the restrictive covenants to achieve the result we judges think the drafter intended.

deed restrictions when the would-be enforcer has unclean hands. "It is the policy of the courts of this State to protect property owners who have not themselves violated restrictions in the enjoyment of their homes and holdings . . . ." *Carey v Lauhoff*, 301 Mich 168, 172; 3 NW2d 67 (1942) (quotation marks and citation omitted). We reject such extreme readings for good reason—this sort of cartoonish strict constructionism would read the restrictive covenants out of existence.

## b. CONTEXT OF THE COVENANTS

If the words of the covenant are the foundation, the surrounding text is the framing that gives structure and defines inside from outside. Words "should not be construed in the void, but should be read together to harmonize the meaning, giving effect to the [agreement] as a whole." *G C Timmis & Co v Guardian Alarm Co*, 468 Mich 416, 421; 662 NW2d 710 (2003), quoting *Gen Motors Corp v Erves (On Rehearing)*, 399 Mich 241, 255; 249 NW2d 41 (1976) (opinion by COLEMAN, J.). The plaintiffs' complaint is grounded in § 1.C.4, which provides miscellaneous residential dwelling restrictions:

> 4. <u>Miscellaneous Provisions</u>. The height of any building will not be more than four (4) stories. If any portion of a level or floor within a residence is below grade, all of the level or floor shall be considered a basement level. *All residences shall be stick built on site and no geodesic dome, berm house, pre-fabricated or modular home, mobile home, shack or barn will be erected on any of the Parcels unless provided for herein*. [Emphasis added.]

The other terms in the list alongside modular home are contextually important. Under the doctrine of *noscitur a sociis*, a thing is known by the company it keeps. *Koontz v Ameritech Servs, Inc*, 466 Mich 304, 318; 645 NW2d 34 (2002). And so a modular home is of a kind with prefabricated homes, geodesic domes, berm-houses, mobile homes, shacks, and barns.

14

We know that the covenants proscribe modular homes, along with these others like them. But the restrictive covenants also *prescribe* certain characteristics for homes in the neighborhood. This no-modular-home provision sits among several other requirements for residential dwellings. And these are also contextually meaningful: a compliant home will meet minimum square footage requirements (1400 square feet for a one-story residence, 1800 for a one and one-half story residence, and 2400 for a two-story residence) and be constructed using "[a]cceptable exterior materials," which "include cedar, brick, vinyl, aluminum, field stone, drivit and any other material considered to be a premium building component," and all construction must be done by residential homebuilders licensed by the state of Michigan.

### c. THE REST OF THE COVENANTS

Finally, the meaning of the term "modular home" in the restrictive covenants as a whole is important. The restrictive covenants refer to modular homes two other times. When a document repeatedly uses a term or phrase, we assume that it carries the same meaning throughout. See 11 Williston, Contracts (4th ed), § 32:6, p 709 ("Generally, a word used by the parties in one sense will be given the same meaning throughout the contract in the absence of countervailing reasons."); *Robinson v Lansing*, 486 Mich 1, 17; 782 NW2d 171 (2010) (applying the canon of consistent usage to statutory language).

Section 1.B.3 includes modular homes as one subset within the category of relocated residences. That provision, titled "Relocated Residences," provides:

> No *residences*, including modular, manufactured, mobile or prefabricated homes, may be *moved* from a location outside [Timber Ridge Bay] and *placed* or located within a Parcel within [Timber Ridge Bay].

Similarly, § 1.B.4, titled "Manufactured Housing Units," provides: "No *manufactured homes*, whether classified as a mobile home, modular home, or otherwise, and no prefabricated homes shall be permitted . . . ." (Emphasis added.) Thus, as used in these sections, a "modular home" can be relocated and can be considered a subset of "manufactured homes" or "manufactured housing units."[5]

This too: in each instance, the restrictive covenants use a pattern of specific verbs to refer to modular homes and their peers—the covenants state that modular, manufactured, mobile, or prefabricated homes may not be *moved*, *placed*, *located*, or *erected* within a parcel in Timber Ridge Bay.[6]   In contrast, the covenants refer to *construction* when discussing allowed structures.[7]  The covenants' use of different terms suggests an important difference between a permissible home and a prohibited one in how it comes to be built— which makes sense given that the covenants require that all residences be "stick built on

_____

[5] Mobile and manufactured homes are built on an automotive-type frame that incorporates an axle or metal chassis.  Additionally, some manufactured homes could be called modular, in the sense that a mobile or manufactured home can be a double- or triple-wide unit—two or three manufactured home units put together.  On the other hand, most modular homes are not manufactured homes because they do not conform to the proper building codes (federal standards set by the United States Department of Housing and Urban Development) and lack the chassis or axle used to transport manufactured homes.

[6] Similarly, the covenants state that "[t]emporary buildings *are allowed* prior to and during the construction of the residential dwelling for a total period not to exceed twenty-four (24) months." (Emphasis added.)

[7] The only apparent exception is in § 1.D.2: "Setback Lines.  No building will be erected on any other Parcel nearer to the street line . . . than permitted by the setback requirements . . . ."  This usage can still cohere with the others, because § 1.D.1 defines "building" using a nonexhaustive list.  For example, a lot owner could erect a greenhouse as her permitted outbuilding.

site." Using verbs like *move*, *place*, or *locate* suggests picking up a thing that already exists and plunking it down on the lot, fully formed.

A closer question is whether there is a meaningful difference between a structure that is *constructed* versus *erected*. The two words, though rough synonyms, have distinct undertones.[8] *To construct* evokes forming or creating a structure by putting together its parts. *To erect* connotes assembling or raising a structure.

This reading makes sense in the context of the restrictive covenants: a geodesic dome can be purchased in a kit and assembled, as can a berm house.[9] And the term "barn-

---

[8] Their dictionary definitions reflect their distinct qualities, while also recognizing a degree of overlap. See, e.g., *Webster's New Twentieth Century Dictionary Unabridged* (2d ed) (defining "construct," in pertinent part, as "1. to put together the parts of in their proper place and order; to build; to form; as, to *construct* an edifice; to *construct* a telescope" and defining "erect," in pertinent part, as "2. (a) to raise, as a building; to construct; to build; as, to *erect* a house or a church; to *erect* a fort; (b) to put together the component parts of, as of a locomotive, a printing press, a dynamo, or other machine; to assemble"); *Webster's Third New International Dictionary, Unabridged Edition* (1966) (defining "construct," in pertinent part, as "to form, make, or create by combining parts or elements : BUILD, FABRICATE" and defining "erect," in pertinent part, as "to put up (as a building or machine) by the fitting together of materials or parts : cause to stand ready for use : BUILD . . . ; *specif* : to hoist and bolt in place fabricated parts of (a ship's structure) before riveting or welding"); *Webster's New International Dictionary of the English Language Unabridged* (2d ed) (defining "construct," in pertinent part, as "**2.** To put together the constituent parts of (something) in their proper place and order; to build; form; make; as, to *construct* an edifice" and defining "erect," in pertinent part, as "**1.** To raise, as a building; to build; construct; as, to *erect* a house . . . **4.** To raise and place in an upright position; to set upright; rear; as, to *erect* a pole, a flagstaff, a statue, etc."); *The Oxford English Dictionary* (2d ed) (defining "construct," in pertinent part, as "**1.** . . . To make or form by fitting the parts together; to frame, build, erect" and defining "erect," in pertinent part, as "**III.** To set on a foundation, construct, establish. **7.** To set up (a building, statue, framework, etc.); to rear, build").

[9] Admittedly, the geodesic dome and berm house seem to be mentioned by name in the miscellaneous provision to make doubly sure that no one stick-builds an Epcot dome or a hobbit hole that otherwise complies with the restrictive covenants.

17

raising" calls to mind the framed walls of a barn or shack pulled upright with ropes. Similarly, some modular construction requires mere assembly (e.g., a triple-wide trailer or an entirely modular home) or to be set up or raised (e.g., a manufactured home). The trial court recognized this distinction: "[A]n *entirely* modular, premanufactured or prefabricated home cannot be moved onto the properties located within Timber Ridge Bay . . . ." (Emphasis added.)

### d. THE PURPOSE OF THE COVENANTS

Finally, even an unambiguous term must be construed relative to the drafter's intent. *Tabern*, 231 Mich at 583. The restrictive covenants' stated purpose is "to provide for congenial occupancy of the Premises, and for the protection of the value of the Parcels therein . . . ."

### e. A DEFINITION

With this text and context, we can put the pieces together to determine where the restrictor intended to draw the line. First, the covenants categorically bar landowners from moving or placing relocated residences or manufactured homes onto a parcel. These categorical restrictions apply to any structure that may be considered, without substantial further construction, to be a home or residence upon delivery.

The covenants also impose construction and design standards beyond these categorical restrictions. We agree with the trial court that, at a minimum, an entirely prefabricated, manufactured, or modular home cannot be placed on or moved to a lot in Timber Ridge Bay. But the language of the covenants imposes a more stringent standard than the trial court found. A fair reading of a modifier like "modular" applies its meaning

18

to the noun as a whole.  The limiting factor is the extent to which the noun accepts the modifier.  A homogenous or abstract thing often accepts the modifier wholly (a blue circle, a truthful statement); most things that exist in the real world have some degree of heterogeneity and fully accept modifiers within the bounds of reason (a red car, a friendly neighbor).  And houses, like cars or people, are not just one thing.

The most natural reading of the prohibition in § 1.B.4 against "modular home[s]" and "prefabricated homes" is to prohibit homes that are mostly modular or prefabricated. That is, a home is a modular home under the restrictive covenants if it is predominantly modular—more modular than not.

The covenants enforce construction standards from the opposite side, too: homes in the subdivision must be stick-built on-site.  The stick-built requirement forecloses the loophole for the 33% modular, 33% prefabricated, and 34% site-built franken-home.  In short, a home must be predominantly stick-built on-site, and a home built using predominantly modular construction cannot be erected in Timber Ridge Bay.  These are, of course, questions of fact for the jury or fact-finder.

And the covenants suggest that in close cases a court has other tools.[10]  It may consider whether the home otherwise complies with building standards of the

---

[10] Although the dissent makes much of the "professional characterizations" in this case, none of those characterizations help us answer the question presented here—when does a home constructed with modular components become a modular home under the restrictive covenants?  The opinions of the township's building official, the appraiser, and the author of Heritage Custom Builders' blog are of limited usefulness, since none of those characterizations was made in the context of the restrictive covenants at issue.

And the remaining "professional characterizations" cited by the dissent merely confirm that some portion of the home is modular.  For example, on the building permit

19

application, the box "modular" was checked—but a builder would check this box for any home that contained a modular component. Expert testimony at trial made clear that the function of the check box is *not* to provide a definitive description of a home's essential character but to "alert[] the building inspector that there is a different type of inspection that has to be done" on the modular portion. See generally Mich Admin Code, R 408.31101 *et seq*.

Modular components are inspected differently because they are preapproved by the state before being installed—the "Building System Approval Report" refers to this preapproval process for a "premanufactured unit" under Part 11 of the Construction Code Commission General Rules. Mich Admin Code, R 408.31106(4) defines "premanufactured unit" as

> an assembly of materials or products intended to comprise all or part of a building or structure, and that is assembled, at other than the final location of the unit of the building or structure, by a repetitive process under circumstances intended to insure uniformity of quality and material content. The term includes a mobile home.

True enough, as the dissent notes, "the 'type of unit' to be inspected was characterized [in the Building System Approval Report] as '[m]odular.' " But the "unit" in question *was a module*. And we can all agree that the modules themselves are modular.

The dissent's other professional sources suffer the same flaw: JM Quality Construction, LLC, " 'specializ[es] in modular set up,' " and it did, in fact, set up modular components. Ritz-Craft, the company that manufactured the modular components, might describe itself as a " 'modular home manufacturer,' " but the Goyingses did not purchase a modular home from Ritz-Craft; they contracted with Cassidy Builders and Heritage Custom Builders to construct a home that incorporated Ritz-Craft modules. Michael Coeling, the general manager of Cassidy Builders, testified that Ritz-Craft is "a supplier to Cassidy Builders through the design arm of Heritage Custom Builders just in the same way that Carter Lumber is one of our suppliers or Shoemaker Heating and Cooling is one of our suppliers through a subcontractor."

Though all these sources demonstrate that the Goyingses' home is partly modular, they provide no guidance as to whether the modular components were extensive enough to violate the restrictive covenants. To be sure, these characterizations would be dispositive if we were to interpret the covenants as prohibiting any structure that contains a module. But none of us thinks that is the correct lens. Our disagreement is narrower—whether the covenants prohibit homes that are "substantially modular" or "predominantly modular." And the sources on the dissent's bulleted list don't shift the balance on that question.

neighborhood and whether the home threatens the "congenial occupancy" or "value of the Parcels" in the subdivision.[11]

## 2. THE GOYINGSES' HOME IS NOT A "PRE-FABRICATED OR MODULAR HOME" UNDER THE RESTRICTIVE COVENANTS

Applying the covenants to the undisputed facts found by the trial court, we conclude that the defendants' home is not a "pre-fabricated or modular home" as the restrictive covenants use that term.

The plaintiffs did not establish that the Goyingses' home violates either of the two narrow restrictions. The home does not fit the definition in § 1.B.3 of "relocated residence"—the modules were not a "residence" when placed on the lot. According to the builder, each component was "just a raw piece of construction material" and was "[n]ot even close" to being habitable without extensive on-site construction. The trial court expressly found as much: "The modules here are not a residence as they are delivered; additional construction is required to add in the electrical, duct work, plumbing, roof, and the various components that make a house a habitable home."

---

[11] But appeal to congeniality is out of place on this record—the trial court stated that "[t]he aesthetics, quality and value are of the same standards as the other homes which exist and will be built within the subdivision." And the plaintiffs have not challenged that finding. To the contrary, they emphasize that such subjective considerations "would . . . creat[e] chaos in the enforcement of the Restrictive Covenant." We agree. The freedom to contract and rule of law are impaired—not protected—if enforcement of restrictive covenants in Timber Ridge Bay turns on a judge's gut feeling that a home threatens "congenial occupancy" of the neighborhood or her intuition of what it means to be "substantially" modular. We think our interpretation of the language of these restrictive covenants protects the parties on *both* sides of the contract because it constrains judicial discretion rather than amplifying it.

Nor does the Goyingses' home breach the prohibition in § 1.B.4 against "manufactured housing units." The plaintiffs have not argued that the Goyingses' home is a "manufactured home" or "manufactured housing unit," nor would their home fit the common understanding of those terms—"manufactured home" is an industry euphemism coined for mobile homes. The Goyingses' home does not fit the covenants' categorical use of the term "modular home" because their home is not a manufactured housing unit, nor could the three modular components fairly be called a "residence" when delivered to the construction site.

Finally, with a definition of a "modular home" drawn from the text and context of the restrictive covenants, we can assess this home according to the undisputed facts. We reject the trial court's conclusion that the covenants apply only to "entirely modular" homes. As the plaintiffs say, it's unclear whether such a thing exists. This too-narrow reading is just as divorced from the restrictive covenants' language as the too-broad reading we already rejected.

That said, the language of the restrictive covenants supports the trial court's finding that there is a distinction between a modular or prefabricated home and a site-built home with modular or prefabricated components. And the trial court found that the defendants' home was mainly stick-built, with modular components integrated into it.

We agree. The Court of Appeals erred when it held that the defendants' home violated the unambiguous terms of the covenant and that "the only solution was to grant injunctive relief and order that the non-conforming home be removed." *Thiel*, unpub op at 6. The panel found that this result was self-evident, given the dictionary definition of the word "modular." But the panel set up a straw man: it cited a definition of modular that all

could agree upon and concluded that if the modular components used here fit that definition, then, *ipso facto*, the Goyingses' home was a modular home. This faulty reasoning allowed the panel to wrap up its analysis before it ever reached the parties' dispute: how to construe the term "modular *home*." As a result, it provided no textual support for its implicit conclusion that the covenants prohibit any home that contains a module.

There is nothing ambiguous about the terms "modular" or "home," or even "modular home." And we find that the fairest reading of the unambiguous terms of the restrictive covenants is to prohibit homes that are predominantly composed of modular components. The Goyingses' home is not a "modular home" as the restrictive covenants use the term.[12]

---

[12] The dissent arrives at the contrary conclusion by adopting a standard that a modular home is one that "was substantially fit or fixed together using standardized, transportable, and prefabricated components for easy construction." But the dissent's guidance regarding how to apply this standard demonstrates that it is a subjective one left to a reviewing judge's whims. By allowing for "a litany of factors" to be considered and weighed in whatever way a court deems appropriate, the dissent's approach would allow for essentially unchecked judicial discretion. It seems to us that *that* approach, not ours, leads to uncertainty about what the covenants mean—thereby contravening the intentions of the parties—by leaving it to judges on a case-by-case basis to determine which "factors" support the conclusion that the home is modular and which do not and how to weigh each factor. Some areas of law resist black-and-white interpretations—as the dissent explains, legal terms of art like reasonableness, custody, and proportionate sentencing (and even the equitable remedy the plaintiffs seek) chafe against bright-line rules. But in this case, we undertake the unremarkable task of assigning plain meaning to unambiguous contractual language. We prefer to rely on the text and context of the covenants. And the text of these restrictive covenants would buckle under the weight of the dissent's interpretive approach.

### III. CONCLUSION

The Timber Ridge Bay restrictive covenants unambiguously prohibit modular homes. The materials, workmanship, quality, and outward appearance of the defendants' home are indistinguishable from a site-built home. And modular components don't necessarily make a modular home. The covenants give us text and context to determine what a modular home is. A fair reading of those covenants prohibits a home that is more modular than not. And the Goyingses' home is mostly not modular.

For these reasons, we reverse the opinion of the Court of Appeals and reinstate the decision of the trial court.

Bridget M. McCormack
David F. Viviano
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh

24

STATE OF MICHIGAN

SUPREME COURT

MATTHEW T. THIEL and NIKOLE M.
THIEL,

        Plaintiffs/Counterdefendants-
        Appellees,

and

WILLIAM TRAYWICK and MARCIA
TRAYWICK

        Intervening
        Plaintiffs/Counterdefendants-
        Appellees,

v                                  No. 156708

DAVID L. GOYINGS and HELEN M.
GOYINGS,

        Defendants/Counterplaintiffs-
        Appellants.

_____

VIVIANO, J. (*concurring*).

I concur in full with the majority's decision in this case. I write separately to explain what I believe would be an alternate basis for reversal, namely, the Court of Appeals' erroneous conclusion that "where defendants' home was in clear violation of the unambiguous restrictive covenant, the only solution was to grant injunctive relief and order that the non-conforming home be removed."[1] For this holding, the Court of Appeals relied

---

[1] *Thiel v Goyings*, unpublished per curiam opinion of the Court of Appeals, issued

upon its prior decision in *Webb v Smith*,[2] which in turn relied upon a case from our Court, *Cooper v Kovan*.[3] Since *Cooper* was decided just over 60 years ago, the Court of Appeals has interpreted our decision in that case as establishing a per se rule that, absent three specific circumstances, a trial court must enforce by injunction a valid restrictive covenant.[4] While *Cooper* is not a model of clarity, the Court of Appeals' reading of *Cooper* conflicts not only with our caselaw prior to *Cooper*, but also with general principles of equity. In an appropriate future case, I believe the Court should clarify that *Cooper* did not abrogate the rule long recognized by our Court that the enforcement of a restrictive covenant is a matter of the trial court's discretion.

*Cooper*, decided in 1957, involved a restrictive covenant limiting certain lots to residential use.[5] The plaintiffs in that case, nearby residential property owners, sought to enjoin defendants from building a shopping center on certain lots subject to the restriction.[6]

---

August 8, 2017 (Docket No. 333000), p 6. The dissent apparently agrees with this assertion, having repeated some variant of it several times. See *post* at 2 ("[I]t must be removed, as the Court of Appeals correctly concluded."), 18 ("I agree with the Court of Appeals that the appropriate remedy in this case is the removal of the home."), 22 ("Given the circumstances of the instant case, the only effective remedy is the removal or dismantling of the home."), 22 ("I agree with the Court of Appeals that no other remedy will more reasonably suffice and that the 'only solution [is] to grant injunctive relief and order that the non-conforming home be removed.' "), and 30 ("I would affirm the Court of Appeals' determination that the home be removed.").

[2] *Webb v Smith (After Second Remand)*, 224 Mich App 203, 211; 568 NW2d 378 (1997).

[3] *Cooper v Kovan*, 349 Mich 520; 84 NW2d 859 (1957).

[4] See notes 15 and 16 of this opinion.

[5] *Cooper*, 349 Mich at 523-524.

[6] *Id*.

The trial court, in an effort to craft an equitable remedy, entered an injunction that, rather than barring the defendants from building on the restricted lots completely, permitted the defendants to build their shopping center on some, but not all, of the restricted lots.[7]  This Court explained that the trial court's remedy raised the question of "whether the circuit judge sitting in equity had power to effect such a compromise in the face of and at the expense of existing and valid residential restrictions, or whether such planning must be left to planning boards and private developers."[8]  In reaching the latter conclusion, the Court made the following statement:

> We are unable to find that this power lies in judicial hands.  As equitable exceptions to the general rule that the courts will enforce valid restrictions by injunction we find these: (a) Technical violations and absence of substantial injury; (b) Changed conditions; (c) Limitations and laches.  26 CJS Deeds, § 171.[9]

After concluding that the defendants had not established any of these three defenses, the Court remanded for entry of an injunction enforcing the restrictive covenant.[10]

But there is a serious deficiency in *Cooper*'s analysis.  In particular, Corpus Juris Secundum, which *Cooper* cited, does not provide support for a rule limiting the court's

---

[7] *Id*. at 525-526.

[8] *Id*. at 530.

[9] *Id*.

[10] *Id*. at 533.  Notably, the trial court in *Cooper* had concluded that the restrictions "should be enforced."  *Id*.  Thus, this Court was not required to weigh upon the trial court's decision of whether to enforce the restrictions, but only upon whether the trial court erred by entering an injunction that departed from the terms of the parties' covenant and that neither party sought.

discretion to consideration of these three defenses. *Cooper* simply recited the subheadings listed in the treatise under "**§ 171. —Enforcement.**" In the edition of the treatise in effect at the time *Cooper* was decided, these subheadings were:

> a. In general
>
> b. Technical violations and absence of substantial injury
>
> c. Changed conditions
>
> d. Limitation; laches[.][11]

Looking to the body of § 171, however, it is clear that the treatise did not treat these three defenses as the only considerations for a court to weigh when determining whether enforcement of a restrictive covenant is appropriate. For example, under the "a. In general" subheading, the treatise listed the following circumstances in which enforcement may not be appropriate:

> Restrictive covenants, to be enforceable in equity, must be reasonable. Further, they must not be vague or uncertain, nor may the right to relief be doubtful; and where a restrictive covenant is being used as a means of annoyance or oppression, equity may cancel it. . . . Equity will withhold its hand where such a restrictive is sought to be created by parol, where the reason for the enforcement of the covenant has entirely ceased, or where the consequences of enforcement would be inequitable . . . .[12]

Moreover, regarding whether enforcement of a restrictive covenant by injunction is appropriate, the treatise guided the reader to 43 CJS, Injunctions, § 87, which specifically

---

[11] 26 CJS (1956), Deeds, § 171, p 1172.

[12] *Id*. at 1175.

4

discussed the enforcement by injunction of "**Covenants as to Use of Property.**"[13]  43 CJS (1945), Injunctions, § 87, p 583, provided that "the enforcement by injunction of restrictive covenants as to the use of land is a matter of discretion with the court and not a matter of absolute right, and is governed by the same general rules which control equitable relief by specific performance."  Thus, the section of the Corpus Juris Secundum cited by the Court in *Cooper* does not support the conclusion that a court's discretion is limited to only certain considerations when determining whether to issue an injunction enforcing a restrictive covenant.

Despite the flaw in its analysis, this Court has not revisited *Cooper* in the years since it was decided.[14]  The Court of Appeals, however, has interpreted *Cooper* as establishing a per se rule requiring enforcement of a restrictive covenant by injunction unless one of the three exceptions mentioned in *Cooper* is present.  In *Webb*, the Court of Appeals explained that "[i]n *Cooper* . . . our Supreme Court set forth three equitable exceptions to the general enforcement rule: (1) technical violations and absence of substantial injury, (2) changed

---

[13] *Id*. at 1174-1175 ("The right to enjoin violations of restrictive covenants as to the use of land is discussed in Injunctions § 87[.]").

[14] The dissent also takes issue with *Cooper*, but for a different reason.  In particular, the dissent asserts that, by recognizing an equitable defense for "technical violations," *Cooper* "stands out as a distinct outlier in this Court's jurisprudence . . . ."  See *post* at 25.  The dissent is right that *Cooper* made us an outlier but for the wrong reason—as it has been interpreted by the Court of Appeals, the *Cooper* rule contradicts centuries of our common-law jurisprudence in this area and leading treatises.  Dispensing with more of the trial court's equitable discretion merely because our Court has not cited *Cooper* for this reason is not only unsound but also would make our rule even more aberrational.

5

conditions, and (3) limitations and laches."[15]  Since *Webb*, numerous unpublished Court of

Appeals decisions have held, in even stronger terms, beyond consideration of these three

defenses, that *Cooper* eliminated a trial court's discretion in this area.[16]  At least one

Michigan treatise has also interpreted *Cooper* as setting forth the only three equitable

considerations in this context.[17]  Occasionally, however, Michigan courts post-*Cooper*

---

[15] *Webb*, 224 Mich App at 211.

[16] See, e.g., *Upper Long Lake Estates Ass'n v Scheid*, unpublished per curiam opinion of the Court of Appeals, issued June 28, 2005 (Docket No. 253234), p 2 ("There are three equitable exceptions to the general enforcement rule: (1) technical violations and absence of substantial injury, (2) changed conditions, and (3) limitations and laches."); *Thom v Palushaj*, unpublished per curiam opinion of the Court of Appeals, issued August 23, 2007 (Docket No. 268074), p 5 ("[T]he Supreme Court in *Cooper v Kovan*, 349 Mich 520, 530; 84 NW2d 859 (1957), only identified three equitable exceptions to the general rule of enforcing deed restrictions: (1) technical violations and the absence of substantial injury, (2) changed conditions and (3) limitations and laches."); *Millpointe of Hartland Condo Ass'n v Cipolla*, unpublished per curiam opinion of the Court of Appeals, issued May 11, 2010 (Docket No. 289668), p 3 ("[T]he only established equitable reasons for the courts not to enforce it would be if the only violation was a harmless technical one, if there are changed conditions, or limitations and laches.  See *Cooper v Kovan*, 349 Mich 520, 530; 84 NW2d 859 (1957).").

[17] 3 Michigan Civil Jurisprudence (2019 rev), Building Restrictions, § 34, p 563 ("Michigan recognizes certain exceptions to its general policy of enforcing valid real property restrictions; specifically, a violation of an otherwise valid restrictive covenant may be allowed by a court to remain under any of the following circumstances: (1) The violation is a technical one and there is an absence of substantial injury; (2) The violator shows the existence of changed conditions; or (3) Enforcement may be avoided due to limitations or laches.").  See also Hosler, *Equitable Exceptions to Enforceability of Restrictive Covenants by Injunction in Michigan*, 42 Mich Real Prop Rev 9, 9 (2015) ("[I]n Michigan, there are three equitable exceptions to the general enforcement by injunction of valid, unambiguous deed restrictions.  The Michigan Supreme Court created these three exceptions in 1957 in *Cooper v Kovan*, and they remain the current standard: (1) Technical violations and absence of substantial injury; (2) Changed circumstances; and (3) Limitations and laches.").

have hinted at the trial court's discretion in enforcing restrictive covenants.[18]

Reading *Cooper* in light of our prior caselaw, it is clear that *Cooper* did not set forth a rule limiting the trial court's discretion to consideration of only three specific equitable defenses. Prior to *Cooper*, our Court consistently recognized that the decision whether to enforce a restrictive covenant by injunction is a matter left to the discretion of the trial court, sitting in equity. For example, in *Baxter v Ogooshevitz*, the Court stated, " 'The enforcement in a court of equity of restrictive covenants in a deed is not a matter of absolute right, and is governed by the same general rules which control equitable relief by specific performance.' "[19] Again, in *Cherry v Bd of Home Missions of Reformed Church in US*, we explained that "[c]ourts of equity in passing upon cases of this character grant or withhold injunctive relief depending upon the accomplishment of an equitable result in the light of

---

[18] See, e.g., *Sun Oil Co v Trent Auto Wash, Inc*, 379 Mich 182, 191; 150 NW2d 818 (1967) (holding that the question of whether to enforce a restriction "is a traditional equity action which does not lend itself to summary disposition"); *Becker v Richards*, unpublished per curiam opinion of the Court of Appeals, issued August 3, 2004 (Docket No. 245423), p 6 ("Although it is settled that owners of property, to which restrictive covenants have attached, may invoke a court's equitable jurisdiction to enforce even *de minimis* violations, *Terrien v Zwit*, 467 Mich 56, 65; 648 NW2d 602 (2002); *Oosterhouse v Brummel*, 343 Mich 283, 289; 72 NW2d 6 (1955), whether to grant relief is still within the discretion of the trial court. 'Courts of equity . . . grant or withhold injunctive relief depending upon the accomplishment of an equitable result in the light of all of the circumstances surrounding the particular case.' *Id*. at 290. This does not mean the trial court must employ a balancing test but requests for equitable relief may denied [sic] on the basis of equitable defenses. *Webb*, *supra* at 211, citing *Cooper*, *supra* at 530."). See also 10A Michigan Pleading & Practice (2d ed, 2018 rev), Injunctions, § 76:75, pp 898-899 ("Whether building restrictions will be enforced depends entirely on the facts in each particular case and on the accomplishment of an equitable result in light of the surrounding circumstances.").

[19] *Baxter v Ogooshevitz*, 205 Mich 249, 256; 171 NW 385 (1919).

all of the circumstances surrounding the particular case."[20]  And, in *Oosterhouse v Brummel*,[21] none of Cooper's equitable defenses was present, but the Court held that whether to issue an injunction was "a matter for the discretion of the trial chancellor" and depended upon "the accomplishment of an equitable result in the light of all of the circumstances surrounding the particular case."[22]  Multiple other cases decided before *Cooper* recognized the same principle.[23]

Nor is this principle limited to the context of an injunction enforcing a restrictive covenant.  Our Court has long recognized that an injunction, as an equitable remedy, is never available as of right but is always left to the discretion of the trial court.[24]  This is

---

[20] *Cherry v Bd of Home Missions of Reformed Church in US*, 254 Mich 496, 500; 236 NW 841 (1931).

[21] *Oosterhouse v Brummel*, 343 Mich 283; 72 NW2d 6 (1955).

[22] *Id*. at 290.  In light of the fact that *Cooper* was decided less than two years after *Oosterhouse*, and since both were unanimous decisions and were decided by many of the same justices, I believe *Cooper* can hardly be read as overturning *Oosterhouse* and the centuries of common-law jurisprudence that preceded it *sub silentio*.

[23] See, e.g., *Windemere-Grand Improvement & Protective Ass'n v American State Bank of Highland Park*, 205 Mich 539, 548; 172 NW 29 (1919) ("The right and duty of a chancery court to enforce restrictions under its equitable jurisdiction is not absolute.  In the exercise of such jurisdiction the same general equitable considerations and rules are recognized as move the court in passing upon applications to compel specific performance of contracts."); *Putnam v Ernst*, 232 Mich 682, 687; 206 NW 527 (1925) ("These building restriction cases present such wide difference in facts that, in equity, but few rules can be applied generally. In the main, each case must be determined on its own facts."); *Johnstone v Detroit, G H & M R Co*, 245 Mich 65, 86; 222 NW 325 (1928) ("[S]pecific performance of building restrictions by injunction is not a matter of absolute legal right, but is governed by equitable considerations."); *Harrigan v Mulcare*, 313 Mich 594, 607; 22 NW2d 103 (1946), quoting *Cherry*, 254 Mich at 500.

[24] See *Howard v Lovett*, 198 Mich 710, 717; 165 NW 634 (1917) ("The writ of injunction is not a writ of right, but its issuance rests in sound judicial discretion[.]"); *Hasselbring v*

true regardless of the context in which an injunction is sought, whether by a party seeking to enjoin a nuisance,[25] an encroachment,[26] interference with an easement,[27] or any other wrong. This principle flows from the equitable roots of the remedy—just as a court of equity exercised its discretion in determining the appropriate relief under any given set of circumstances, so trial courts today must exercise discretion in deciding whether an equitable remedy, such as an injunction, is appropriate.[28]

---

*Koepke*, 263 Mich 466, 480; 248 NW 869 (1933) ("In cases where a mandatory injunction is sought, the rule in England, and generally in this country, and particularly in Michigan, is that the court will balance the benefit of an injunction to plaintiff against the inconvenience and damage to defendant, and grant an injunction or award damages as seems most consistent with justice and equity under all the circumstances of the case.") (citations omitted).

[25] See *Roy v Chevrolet Motor Car Co*, 262 Mich 663, 668-669; 247 NW 774 (1933) ("Granting injunctive relief is within the sound discretion of the court. . . . 'And in granting injunctions against nuisances, as in other cases of relief by injunction, the court may properly be guided by the consideration of the relative convenience and inconvenience of the parties; and if it appears that the benefit resulting to the plaintiff from the granting of the writ will be slight as compared with the injury to the defendant, the relief may be denied and the plaintiff left to the pursuit of his remedy at law.' "), quoting 1 High, Injunctions (4th ed), § 740, p 703.

[26] See *Kratze v Indep Order of Oddfellows*, 442 Mich 136, 142; 500 NW2d 115 (1993) ("Fashioning an appropriate remedy where a structure encroaches on the land of another poses special problems and has resulted in special solutions. In such cases the approach is to balance several factors—the relative hardship to the parties and the equities between them—and to grant or deny the injunction as the balance may seem to indicate.") (quotation marks and citations omitted).

[27] See *Hasselbring*, 263 Mich at 480 (explaining, in the context of an action to enjoin interference with an easement, "that the court will balance the benefit of an injunction to plaintiff against the inconvenience and damage to defendant, and grant an injunction or award damages as seems most consistent with justice and equity under all the circumstances of the case").

[28] See *Holland v Miller*, 325 Mich 604, 611-612; 39 NW2d 87 (1949) ("Granting injunctive

It is true that, in the context of a restrictive covenant, our Court has consistently held

that enforcement of valid restrictions is favored by public policy and that, as a general rule,

we will enforce such restrictions by injunction.[29]   Accordingly, we have warned against

relief is within the sound discretion of the court. . . .  Broadly speaking the sound discretion of the court is the controlling guide of judicial action in every phase of a suit in equity.  So the granting of equitable relief is ordinarily a matter of grace, and whether a court of equity will exercise its jurisdiction, and the propriety of affording equitable relief, rests in the sound discretion of the court, to be exercised according to the circumstances and exigencies of each particular case.") (quotation marks and citations omitted).  See also 43A CJS, Injunctions, § 24, pp 38-39 ("The grant of, or the refusal to grant, an injunction invokes the court's equitable powers. . . .  The propriety of granting an injunction depends on the facts of each particular case, and on general principles of equity.").  See also *Fenestra Inc v Gulf American Land Corp*, 377 Mich 565, 593; 141 NW2d 36 (1966) ("[A]lthough the procedural distinctions between law and equity have been abolished in this State since January 1, 1963 . . . , the substantive elements of a cause of action and the kind of remedy available must still be determined by reference to the substantive law of actions in law and equity as they existed before the merger.").

Contrary to the dissent's charge, I do not traffic in " 'vague equit[ies]' " or encourage judicial navel-gazing.  Instead, I am simply recognizing a legal principle that is centuries old and well settled in our law.  I did not think this was a controversial point since it is the very reason that courts of equity sprung up in the first place.  See Rehnquist, *The Supreme Court* (New York: First Vintage Books ed, 2002), pp 157-158 ("To mitigate the harshness of some of the results reached in the common-law courts, the king's chancellor began dispensing a second brand of justice known as 'equity.'  An injunction—which is nothing more than a court order directed to a party and requiring the party either to do something or not to do something—was a creature of the courts of equity, and because of this, one was never automatically entitled upon a showing of a particular set of facts to obtain an injunction; it was a matter of discretion with the court, based on a careful weighing of all the surrounding circumstances.").  I do not share the dissent's evident distaste for the exercise of sound judicial discretion that has always been inherent in a trial court's decision whether to grant an injunction, and I am not willing to so lightly discard venerable principles of equity under the guise of enforcing the parties' agreement.

[29] See *Signaigo v Begun*, 234 Mich 246, 251; 207 NW 799 (1926) ("[T]his court has not hesitated in proper cases to restrain by injunction the invasion of these valuable property rights."); *Johnstone*, 245 Mich at 74 ("Restrictions for residence purposes, if clearly established by proper instruments, are favored by definite public policy.  The courts have long and vigorously enforced them by specific mandate."); *Carey v Lauhoff*, 301 Mich 168,

courts refusing to enforce a restrictive covenant merely because the violation is *de minimis* or because the plaintiff cannot show actual damages.[30] But these cases never disavowed the principle that trial courts must exercise their discretion in determining whether enforcement by injunction is equitable. Indeed, the cases recognizing this principle have simultaneously recognized that enforcement of restrictive covenants also requires the exercise of discretion.[31]

---

172; 3 NW2d 67 (1942) ("As a rule, we will uphold a restriction whenever it remains of any substantial benefit to the parties objecting to its violation, provided they are not estopped by their conduct from making such objection.") (quotation marks and citation omitted); *Oosterhouse*, 343 Mich at 287 ("Once such restrictions are imposed, however, to all who have come to us in aid thereof, come to us lacking inequity, showing unchanged conditions, together with a reasonable zeal in maintaining the continuing vitality of the restrictions, we have responded with jealousy and alacrity.").

[30] See *Oosterhouse*, 343 Mich at 287 ("The doctrine of *de minimis*, as applied to real property and interests therein, must be applied with the utmost caution."); *Terrien*, 467 Mich at 65 ("This all comes down to the well-understood proposition that a breach of a covenant, no matter how minor and no matter how *de minimis* the damages, can be the subject of enforcement.").

[31] As evidenced in the footnotes above, the same cases stating the general rule that Michigan courts will enforce deed restrictions have also expressly recognized that the trial courts must exercise their equitable discretion in doing so. See, e.g., *Johnstone*, 245 Mich at 74 ("Restrictions for residence purposes, if clearly established by proper instruments, are favored by definite public policy. The courts have long and vigorously enforced them by specific mandate."); *id.* at 86 ("[S]pecific performance of building restrictions by injunction is not a matter of absolute legal right, but is governed by equitable considerations."); *Oosterhouse*, 343 Mich at 287 ("Once such restrictions are imposed, however, to all who have come to us in aid thereof, come to us lacking inequity, showing unchanged conditions, together with a reasonable zeal in maintaining the continuing vitality of the restrictions, we have responded with jealousy and alacrity."); *id.* at 290 ("We are not, of course, passing at this stage of the case upon the propriety of an injunction. That will be a matter for the discretion of the trial chancellor after all matters of defense have been heard.").

Our Court's jurisprudence, adhering to these two principles which may appear to be in tension, accords with the principles recognized by leading treatises. This tension is evident in Tiffany on Real Property:

> An injunction *typically is an appropriate remedy* for breach of a restrictive covenant *but such relief is not automatic*, and the presumption in its favor does not displace a trial court's traditional discretion when it sits in equity. Injunctive relief remains subject to sound judicial discretion even where restrictive covenants and real property rights are concerned.[32]

Other treatises have also recognized that enforcement of restrictive covenants by injunction, as with other equitable remedies, is a matter left to the discretion of the trial court,[33] while also noting that enforcement of a deed by injunction is generally appropriate and does not require a showing of actual damages.[34]

---

[32] 3 Tiffany, Real Property (3d ed, Sept 2018 update), § 858 (emphasis added).

[33] See, e.g., 2 Restatement Property, 3d, Servitudes, § 8.3, comment *b*, pp 494-495 ("Judges have wide discretion in selecting remedies to provide full and appropriate relief to an injured party, and in states with merged law and equity jurisdictions, may mix remedies formerly exclusive to law or equity."); 42 Am Jur POF3d 463, 477, § 7 ("Whether injunctive relief will be granted to restrain the violation of a restrictive covenant is a matter within the sound discretion of the court, to be determined in light of all the facts and circumstances."); 57 ALR 336, 337, § 231 ("[E]ach case in which this remedy is requested is decided upon its particular facts and a consideration of the conduct of the parties in the light of equitable principles, and for this reason any rule as to when a mandatory injunction will or will not be granted would be too general to be useful. It is only by a study of the cases, and especially of those cases in which a mandatory injunction is refused, that an answer can be gained as to when this remedy will be granted."); 43A CJS, Injunctions, § 182, p 204 ("[N]ot every violation of a restrictive agreement relating to the use of realty will be restrained, and each case depends on its own circumstances.").

[34] 43A CJS, Injunctions, § 186, p 210 ("[T]he right to enjoin the breach of restrictive covenants does not depend upon whether the covenantee will be damaged by the breach, as the mere breach is sufficient ground for interference by injunction."); 42 Am Jur POF3d 463, 477, § 7 (same).

Understanding these principles underlying the enforcement of restrictive covenants, this Court's decision in *Cooper* makes sense. The Court in *Cooper* merely recognized that the trial court in that case went too far in an effort to craft an equitable remedy, substituting its own judgment for that of the parties.[35] *Cooper* did not divest trial courts of their equitable discretion to determine whether an injunction is the proper form of relief in light of all the facts, nor did *Cooper* bar consideration of all equitable defenses apart from the three expressly mentioned, such as waiver,[36] estoppel,[37] or unclean hands.[38]

---

[35] See *Oosterhouse*, 343 Mich at 288 ("We do not substitute our judgment for that of the parties, particularly where, as in the instant case, restrictive covenants are the means adopted by them to secure unto themselves the development of a uniform and desirable residential area.").

[36] See *Margolis v Wilson Oil Corp*, 342 Mich 600, 603; 70 NW2d 811 (1955) ("Abandonment of restrictions by permitted violations and resultant change of character of the neighborhood amounts to a waiver."). Indeed, *Cooper* itself mentioned that "[t]he court below found no invalidation of the restrictions by laches or *by waiver*, and we concur," *Cooper*, 349 Mich at 531 (emphasis added), further supporting the conclusion that the Court in *Cooper* did not intend to disavow all equitable defenses aside from the three expressly mentioned.

[37] See *Taylor Avenue Improvement Ass'n v Detroit Trust Co*, 283 Mich 304, 311; 278 NW 75 (1938) ("As a rule, we will uphold a restriction wherever it remains of any substantial benefit to the parties objecting to its violation, provided they are not estopped by their conduct from making such objection."); 42 Am Jur POF3d 463, 482, § 10 ("In the context of an action for breach of covenant, estoppel may be invoked as an equitable defense where the plaintiff has observed the defendant dealing with his property in a manner inconsistent with his rights and makes no objection, while the defendant changes his position in reliance on the plaintiff's silence.").

[38] *Zelinski v Becker*, 318 Mich 209, 215; 27 NW2d 615 (1947) ("Courts protect property owners seeking to enjoin violation of restrictive covenants contained in their deeds where the plaintiffs have not themselves violated restrictions in the enjoyment of their homes and holdings.") (quotation marks and citation omitted); 42 Am Jur POF3d 463, 498, § 17 ("Where the party seeking to enforce the terms of a restrictive covenant is himself guilty

Because I agree with the majority that the Court of Appeals erred by determining that defendants' home was modular, I concur in full with the majority opinion. But even if the Court of Appeals had correctly concluded that defendants' home violated the restrictive covenant, I would still reverse on the basis of the Court of Appeals' erroneous holding that "the only solution was to grant injunctive relief and order that the non-conforming home be removed," and I would remand this case to the trial court so that it could exercise its discretion in determining an equitable remedy.[39]

David F. Viviano
Bridget M. McCormack

---

of violating the covenant, the court may invoke the doctrine of unclean hands to estop that party from enforcing the covenant against the defendant.").

[39] The dissent ignores the long line of cases from our Court, discussed herein, which hold that the decision whether an injunction is an appropriate remedy is a matter for the trial court's discretion. Instead, the dissent apparently undertakes its own review of the equities and summarily concludes that there are "no contrary equitable considerations in the Goyingses' favor . . . ." However, as our caselaw makes clear, since the trial court is accorded discretion in this area, making such a determination in the first instance is not the proper function of an appellate court. See *Oosterhouse*, 343 Mich at 290 ("*We are not, of course, passing at this stage of the case upon the propriety of an injunction. That will be a matter for the discretion of the trial chancellor after all matters of defense have been heard.* Courts of equity . . . grant or withhold injunctive relief depending upon the accomplishment of an equitable result in the light of all of the circumstances surrounding the particular case.") (emphasis added). Thus, even if I agreed with the dissent that defendants' home violated the restrictions, I would remand to the trial court for further proceedings that would allow (1) the parties to present evidence and arguments concerning the appropriate remedy and (2) the trial court to exercise its discretion in determining the appropriate remedy in this case.

S T A T E   O F   M I C H I G A N

SUPREME COURT

MATTEW T. THIEL and NIKOLE M.
THIEL,

           Plaintiffs/Counterdefendants-
           Appellees,

and

WILLIAM TRAYWICK and MARCIA
TRAYWICK,

           Intervening
           Plaintiffs/Counterdefendants-
           Appellees,

v                                                                                        No. 156708

DAVID L. GOYINGS and HELEN M.
GOYINGS,

           Defendants/Counterplaintiffs-
           Appellants.

_____

MARKMAN, J. (*dissenting*).

I respectfully dissent. This case concerns what constitutes a "modular home," but that is not essentially what is at issue. Rather, the central focus of this case is upon the ability of free individuals to determine their rights and duties (and in this case, the nature of their residential environment) with one another through voluntarily-entered-into contracts. "[W]hen parties have freely established their mutual rights and obligations through the formation of unambiguous contracts, the law requires this Court to enforce the terms and conditions contained in such contracts . . . ." *Bloomfield Estates Improvement Ass'n, Inc v Birmingham*, 479 Mich 206, 213; 737 NW2d 670 (2007). The

parties here contracted by means of a covenant that prohibited the erection of modular homes within their subdivision, and defendants acted in violation of this straightforward prohibition. Because this Court must accord regard to the parties' free and voluntary agreement, defendants cannot be permitted to erect such a home, and when they have done so in breach of their promise, it must be removed, as the Court of Appeals correctly concluded.

## I. FACTS AND PROCEDURAL HISTORY

Defendants, David and Helen Goyings, are owners of a parcel of lakefront property in the Timber Ridge Bay subdivision, located in Watson Township, Michigan. Fourteen of the sixteen residential parcels located in Timber Ridge Bay are subject to covenants. These covenants were recorded in the Allegan County register of deeds on December 7, 2006, and the Goyingses purchased their property with full knowledge of these. Relevant to this appeal, the covenants provide:

**COVENANTS, RESTRICTIONS AND CONDITIONS**

Section 1. Establishment of Restrictions. In order to provide for congenial occupancy of the Premises, and for the protection of the value of the Parcels therein, the Parcels 1-14 shall be subject to the limitations set forth below:

* * *

B. Building and Use Restrictions.

* * *

3. Relocated Residences. No residences, including modular, manufactured, mobile or prefabricated homes, may be moved from a location outside the Premises and placed or located within a Parcel within the Premises.

2

4. <u>Manufactured Housing Units</u>. No manufactured homes, whether classified as a mobile home, modular home, or otherwise, and no prefabricated homes shall be permitted on any Parcel in the Premises, regardless of which building codes are applicable to said homes.

\*   \*   \*

C. <u>Residential Dwelling Restrictions</u>

\*   \*   \*

4. <u>Miscellaneous Provisions</u>. The height of any building will not be more than four (4) stories. If any portion of a level or floor within a residence is below grade, all of the level or floor shall be considered a basement level. All residences shall be stick built on site and no geodesic dome, berm house, pre-fabricated or modular home, mobile home, shack or barn will be erected on any of the Parcels unless provided for herein.

On October 1, 2014, the Goyingses entered into a contract with Cassidy Builders, Inc., for the construction of a "29-11 x 56 modular home on 9 ft. walk out basement."[1] Cassidy would build accessory portions of the home, such as the garage, deck, and porch, but Ritz-Craft Corporation of Michigan, Inc., was identified as the manufacturer of the home. Ritz-Craft describes itself as a "Modular Home Manufacturer." The home was further described as "modular" in an application for a building permit; the application characterized the home as a "single family modular with 24 x 24 attached garage, 22 x 6 front porch, 12 x 12 deck." Ritz-Craft thereafter constructed three modules for the home in its indoor facility in Jonesville, Michigan. Once completed in June 2015, the modules were transported from Ritz-Craft's facility to the Goyingses' property.[2] Another

---

[1] Capitalization altered.

[2] Contrary to the majority's repeated assertions, it was never established at trial that the modules were " 'just . . . raw piece[s] of construction material[.]' " In fact, the record

construction company, JM Quality Construction, LLC, assisted in the construction process. JM advertises that it "[s]peciali[zes] in modular set up." The home was to be 59% stick-built, 41% modular, and appraised at $330,000.[3]

On June 18, 2015, within two weeks of the modules being received at the subdivision site, plaintiffs filed suit against the Goyingses, seeking to enforce the covenant prohibiting modular homes and requesting that the trial court enter an order enjoining any further construction of the home. The parties proceeded to trial, with the Goyingses' own appraiser and a building official for Watson Township testifying that the home was modular. The General Manager for Ritz-Craft testified that the home is "systems built" but acknowledged that "[t]here is no difference" in terms of the structure between a "totally modular home" and one that "contains modules but is . . . systems built . . . ." Moreover, because portions of the home had been manufactured off-site, the Single State Construction Code Act, MCL 125.1501 *et seq.*, required that, prior to transport to the Goyingses' property, the modules had to be inspected and approved by the state of Michigan. A subsequent Building System Approval Report prepared under the act also classified the home as modular.

The trial court ultimately entered an order dismissing plaintiffs' claims against the Goyingses, concluding that the home did not violate the covenant because the covenant

---

reveals that the modules arrived at the Goyingses' property furnished with a bathtub, plumbing and lighting fixtures, cabinets, countertops, and mirrors already installed.

[3] As acknowledged even by the majority, the modules "ma[d]e up the bulk of the ground-floor living space[.]" That is, the base of the home itself was comprised of the modular units, such that there could be no viable home without them.

"did not contemplate a home of the type built by [the Goyingses]." However, the Court of Appeals reversed, concluding that the home was, in fact, modular, in breach of the covenant, and thus required to be removed. *Thiel v Goyings*, unpublished per curiam opinion of the Court of Appeals, issued August 8, 2017 (Docket No. 333000).

## II. STANDARD OF REVIEW

The interpretation of covenants, as with other forms of contracts, presents a question of law that this Court reviews de novo. *Terrien v Zwit*, 467 Mich 56, 61; 648 NW2d 602 (2002). A trial court's findings of fact are given deference and reviewed for clear error. *Cooper v Kovan*, 349 Mich 520, 526; 84 NW2d 859 (1957).

## III. ANALYSIS OF VIOLATION

Plaintiffs alleged that the Goyingses violated § 1.C.4 of the covenants, which provides, in relevant part:

> All residences shall be stick built on site and no geodesic dome, berm house, pre-fabricated or modular home, mobile home, shack or barn will be erected on any of the Parcels unless provided for herein.

A review of the common understanding of the term "modular home" plainly compels the conclusion that the Goyingses erected a modular home in contravention of this provision. " 'Because of the fundamental policy of freedom of contract, . . . parties are generally free to agree to whatever specific rules they like, and in most circumstances it is beyond the competence of . . . the courts to interfere with the parties' choice.' " *Port Huron Ed Ass'n v Port Huron Area Sch Dist*, 452 Mich 309, 319; 550 NW2d 228 (1996), quoting *Dep't of Navy v Fed Labor Relations Auth*, 295 US App DC 239, 248; 962 F2d 48 (1992).

5

## A. COVENANTS

"Restrictions for residence purposes," as at issue here, "are particularly favored by public policy and are valuable property rights." *Livonia v Dep't of Social Servs*, 423 Mich 466, 525; 378 NW2d 402 (1985). They are often "means adopted by [parties] to secure unto themselves the development of a uniform and desirable residential area." *Oosterhouse v Brummel*, 343 Mich 283, 288; 72 NW2d 6 (1955). A restrictive covenant, defined as a "[p]rovision . . . limiting the use of the property and prohibiting certain uses," *Black's Law Dictionary* (6th ed), is one of these "means," *Oosterhouse*, 343 Mich at 288. It "represents a contract between" two parties concerning the use of real property. *Bloomfield Estates*, 479 Mich at 212.

Accordingly, principles of contractual interpretation apply in reviewing such a covenant. *Stuart v Chawney*, 454 Mich 200, 210; 560 NW2d 336 (1997). The primary task of this Court in interpreting a contract "is to give effect to the parties' intention at the time they entered into the contract." *Miller-Davis Co v Ahrens Constr, Inc*, 495 Mich 161, 174; 848 NW2d 95 (2014). "[W]here a term is not defined in a contract, we will interpret such term in accordance with its commonly used meaning." *Bloomfield Estates*, 479 Mich at 215 (quotation marks and citation omitted). Terms "must be interpreted by common sense and common usage . . . ." *Burkman v Trowbridge*, 9 Mich 209, 210 (1861). Thus, courts must engage in fair and reasonable, rather than strict, interpretation. See *B Siegel Co v Wayne Circuit Judge*, 183 Mich 145, 153; 149 NW 1015 (1914); Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* (St Paul: Thomson/West, 2012).

6

The majority concludes that the covenant at issue in this case proscribes homes that are "predominantly modular." It reasons that the term "modular" is an adjectival modifier of the noun "home." Therefore, because "modular" is not itself modified by an adverb, we must presume that "modular" modifies "home" as a whole, which the majority equates to the quality of predominance. Thus, it concludes, a home must be "mostly or generally modular" in order to violate the covenant that forbids modular homes. However, by adopting its own rule of "predominance," the majority altogether fails to discern the plain and ordinary-- the most reasonable-- meaning of the term "modular home," ultimately contravening the obvious intentions of the parties as set forth in their covenants.[4] In my view, this case is quite simple, made unnecessarily complex

---

[4] Notably, the majority fails to support its rule of "predominance" with any grammatical, legal, or even logical authority. Rather, it summarily asserts a semantic conclusion that when an adjective modifies a noun, that noun is "mostly or generally" characterized by the substance of that adjective. But there are far too many contrary examples to this supposed "rule" to consider it as self-evident in the least, much less as one that should be generally applied. A blueberry muffin is a muffin that *contains* blueberries, but it is not "mostly or generally" baked using blueberries; a "sugary drink" *contains* sugar, but is not necessarily 50.1% sugar; a car might be described as being of a particular coloration on the basis of its exterior despite the fact that its full surface area, including interior and underbody, is not "predominantly" that color; and a neighbor whose lack of cordiality is reflected only on rare occasions might nonetheless be deemed as lacking in cordiality based exclusively upon these aberrant contacts. There are too many further and obvious examples that could be cited. Thus, the majority's threshold logic draws no support from ordinary exercises of the American English language, and it has no provenance in the law of this state or any other jurisdiction of which we have been made aware. It is an incorrect proposition that a home is not "modular" unless modular units make up at least 50.1% of that home. Instead, a structure may fairly be characterized, *as it has been here by all relevant participants in the process* (except by the Goyingses themselves and even inconsistently on their part) as "modular" on the basis that some significant part of the home is comprised of modular units.

by the majority and ultimately decided wrongly as a result-- there is a covenant that prohibits the erection of a modular home within a particular subdivision, and one party to the covenant has erected a modular home where it was prohibited from doing so.

## B. "MODULARITY"

In settling upon its own standard of modularity, the majority has disregarded the plain and ordinary meaning of the term "modular home." There are three separate references to "modular home" within the covenants. Section 1.C.4 provides that "no . . . modular home . . . will be erected on any of the Parcels," and §§ 1.B.3 and 1.B.4 list modular homes as subsets of specified "Relocated Residences" or "Manufactured Housing Units" that are not permitted to be located or placed upon any covered parcel. While the term "modular home" has the same meaning in each of the provisions, see 11 Williston, Contracts (4th ed), § 32:6, p 709, the context of each use is different. For example, whereas § 1.B.3 contemplates an entire structure being picked up, moved, and relocated onto a parcel on the premises, § 1.C.4 prohibits a modular home from being erected on a parcel in the subdivision. In my judgment, these prohibitions most reasonably are understood as addressing two forms of residential construction: (a) that by which the whole home is constructed elsewhere and transported onto a parcel; and (b) that by which the home is erected, module by module, upon a parcel. Because plaintiffs alleged that the Goyingses violated § 1.C.4, we must ascertain what precisely the parties intended in providing that no modular home be "erected" upon the parcel at issue in the Timber Ridge Bay subdivision.

Section 1.C.4, in its prohibition of modular homes, sets forth three defining terms: home, modular, and erect.   First, a "home" is "one's place of residence."   *Merriam-Webster's Collegiate Dictionary* (11th ed).  Second, "modular" is defined as "constructed with standardized units or dimensions for flexibility and variety in use."   *Merriam-Webster's Collegiate Dictionary* (11th ed).[5]  Third, to "erect" means (a) "to put up by the fitting together of materials or parts : [to] BUILD" or (b) "to fix in an upright position." *Merriam-Webster's Collegiate Dictionary* (11th ed).   Thus, by specifying that "no . . . modular home . . . be erected on any of the Parcels," § 1.C.4 proscribes the "fitting together of materials or parts" to create a "place of residence" that is "constructed using standardized units."   This is the most ordinary and reasonable understanding of modularity: a home is modular when it is a place of residence that was substantially fit or fixed together using standardized, transportable, and prefabricated components for easy construction.[6]

---

[5] The Court of Appeals cited a similar definition of "modular" from *The Random House Dictionary of the English Language: Second Unabridged Edition*: "composed of standardized units or sections for easy construction or flexible arrangement . . . ."  *Thiel*, unpub op at 6.

[6] Other states have characterized the term "modular home" in a similar fashion.  See, e.g., *Henry v Chambron*, 304 SC 351, 352; 404 SE2d 518 (App, 1991) (describing a modular home as one that "is built off site and is transported to its intended location in as many as twenty sections"); *Vester v Banks*, 257 Ga App 26, 28; 570 SE2d 586 (2002) (defining modular home as "a factory-fabricated, transportable structure, consisting of units that are brought in on a trailer, to be constructed on top of a permanent foundation at the site for residential use"); W Va Code § 37-15-2(j) (2018) (" 'Modular home' means any structure that is wholly, or in substantial part, made, fabricated, formed or assembled in manufacturing facilities for installation or assembly and installation on a building site and designed for long-term residential use . . . .").

Yet the majority condemns this understanding, concluding that it "doesn't advance the ball much," opting instead for its own rule of "predominance." But its dismissiveness is grounded upon its own failure to give even passing consideration to the notion that the standard identified in lay dictionaries cannot operate in splendid isolation; rather, it is necessarily given meaning and informed by a litany of factors, each of which might be relevant, or even sometimes determinative, in assessing whether under the totality of circumstances a residence is reasonably characterized as "modular"-- that is, as substantially fit together using standardized, transportable components for easy construction. Among some of the most obvious of these factors are: the proportion of the home that is comprised of modular units;[7] the specific nature of the modular units-- whether these constitute raw building materials, e.g., two-by-fours, trusses, doors, or windows, or rather are comprised of prefabricated and freestanding room-like units that are designed for ordinary residential purposes; and the overall relationship of the modular units to the structure itself-- whether these comprise the essential living quarters of the home or are largely ancillary components or attachments. Each of these-- as well as other-- pertinent factors should be assessed and weighed in the balance of characterizing

---

[7] I do not disagree with the majority that proportions may be helpful in guiding an assessment of modularity; I take issue principally with its "percentage threshold" rule that anything less than 50.1% modularity properly establishes a dwelling as nonmodular.

a modular home.[8]  This assessment is necessarily undertaken along a spectrum rather than

viewed as black or white.[9]

[8] Of course, this Court must give deference to the trial court's factual findings, *Cooper*, 349 Mich at 526, and in this case, the trial court determined that the home was not modular.  However, the trial court was operating under an erroneous understanding of modularity paraphrased by the majority as being applicable only to "*entirely* modular homes."  Significant deference can hardly be accorded when the threshold legal standard has been misapprehended.  See *People v Daoud*, 462 Mich 621, 641; 614 NW2d 152 (2000).

[9] The majority asserts that a virtue of its "predominance" test is that it leaves no room to be "left to a reviewing judge's whims," as presumably it perceives to be a flaw of the test set forth by this dissent.  Perhaps the majority is correct in assessing the virtues of its own standard; perhaps, however, as I believe it to be so, this supposed virtue is more than overcome by its principal flaw-- it is simply an arbitrary and wrong test.  Even accepting the majority's self-characterization of its own test, simplicity of application is not the equivalent of accuracy or appropriateness of a legal test; drawing a line at some random point in the sand is not tantamount to that line being drawn correctly.  As illustrations, this Court might adopt an equally black-or-white test that a suspect is in "custody" for *Miranda* purposes only when he or she has been handcuffed; it might conclude that a person possesses a legitimate expectation of Fourth Amendment privacy only when it can be shown that he or she possesses an ownership of an area; it might adopt a bright-line court rule that the trial court may ask any question of a witness it desires, or it might adopt a rule forbidding any questions at all; or it might adopt judicial sentencing guidelines in which consideration of a convicted person's criminal history and conduct produces a single unalterable sentence rather than a mere sentencing range.  None of these or countless other tests that could easily be imagined would be viewed as particularly virtuous because little had been "left to a reviewing judge's whims."  While constraining the scope of judicial discretion is, in my judgment, generally a strengthening aspect of the rule of law-- see, e.g., the exchanges between myself and the majority justices concerning their replacement of Michigan's discretion-limiting sentencing guidelines with the discretion-enhancing abolition of these guidelines in *People v Lockridge*, 498 Mich 358; 870 NW2d 502 (2015), and *People v Steanhouse*, 500 Mich 453; 902 NW2d 327 (2017)-- not every realm of the law allows for black-or-white legal tests as opposed to more nuanced totality-of-circumstances or assessment-of-factors tests.  In the present context, rather than adopting an entirely novel test of "predominance," I would give due regard to the spectrum along which a finding of modularity must

Applying this standard and attendant factors, it is readily apparent that the Goyingses erected a modular home in contravention of § 1.C.4. Three modular units were manufactured by Ritz-Craft in a factory in Jonesville, Michigan. They were by no means minute components or raw building materials that necessitated any difficult or tedious process of affixation to create a livable structure. Rather, these units were enclosed and freestanding structures that were identified as entire and discrete rooms adorned with doors, windows, cabinets, countertops, mirrors, and lighting and plumbing fixtures. These were of sufficiently substantial construction that each had to be loaded onto its own large trailer for transport to the subdivision and, upon arrival, each of the three required a crane to align and affix them into place.

Indeed, the modules were of such size and substantiality that there could be no home without them; each was intrinsic and indispensable to the ultimate residential structure. Together, their square footage of 1866 square feet perfectly matched that of the ultimate foundation. And when affixed, the modules would comprise the fundamental living quarters of the home, including the dining room, living room, kitchen, main bathroom, utility closet, two bedrooms, master bathroom, and master bedroom. Thus, the portion of the home that was modular in terms of materials-- already a substantial portion in the majority's own arithmetical terms-- constituted an essential portion of the home; while the stick-built portions accessorized or enhanced the home with a garage, deck,

necessarily take place, evaluating each home on the basis of factors understood to define what comprises a modular home, that is, assessing on the basis of these factors whether the home was substantially fit together using prefabricated components for ease of construction.

porch, roof, and an unfinished basement, the modules comprised its core. Absent the modules, the remaining assortment of disconnected stick-built structures could serve little purpose-- they would simply surround an open space. Accordingly, the modular components cannot fairly be described as having been integrated into the overall home; rather, these became the essential home.

This critical fact perhaps most distinguishes the Goyingses' home from the traditional stick-built home, where its frame or core is constructed stick-by-stick, not room-by-room. Thus, because the Goyingses' home was indispensably contingent upon the attaching together of freestanding modular components, it comports with the plain and ordinary-- and most reasonable-- understanding of what comprises a modular home, regardless of whether it achieves the majority's own standard of "predominance."

## C. CHARACTERIZATIONS

Unremarkably, the professional characterizations in this case support this understanding of modularity. Yet, the majority makes not a single mention of these. Since it was merely a figment of the Goyingses' imagination, the home has been considered to be nothing other than modular. Indeed, every professional source, beginning with the building contracts and ending with the inspections and evaluations, has characterized the home as modular, and it is particularly compelling that most of these characterizations *preceded* the instant litigation. I would accord considerable weight to the following characterizations:

13

- The Goyingses contracted with Cassidy Builders regarding "site improvements for 29-11 x 56 modular home on 9 ft. walk out basement."[10]

- The "Application For Building Permit" filed with Watson Township provided a "brief description of project[:] single family modular with 24 x 24 attached garage, 22 x 6 front porch, 12 x 12 deck."[11]   Moreover, the box for "modular" was checked in the "project description" section of the application.

- The Building Permit issued by Watson Township gave permission to "[i]nstall[] [m]odular."   The permit specified that the home was to be a "Modular on an Unfinished Basement w[ith] a Minimum of One Egress, Three Bedrooms, Two Full Baths, Front Porch, Back Deck, Two Stall Attached [Garage]."  Of course, as indicated earlier, the three bedrooms and two full baths were contained entirely within the modules.

- The "Uniform Residential Appraisal Report" prepared by C. Douglas Snell of John A. Meyer Appraisal Company provided that "[t]he subject dwelling is a modular house."

- In the "Building System Approval Report" conducted by the Michigan Department of Licensing and Regulatory Affairs, the "type of unit" to be inspected was characterized as "[m]odular."

- Ritz-Craft was identified as the "[m]anufacturer" in the Goyingses' contract with Cassidy Builders, which specified no other manufacturer.  Ritz-Craft describes itself as a "modular *home* manufacturer."  (Emphasis added.)

- JM Quality Construction assisted with the erection of the modular home.  JM describes its business as "specializing in modular set up."

- Heritage Builders, in its blog, repeatedly referred to the home as a "modular home."

- Kirk Scharphorn is a building official for Watson Township and expert witness in construction codes and inspections.  Before trial, Mr. Scharphorn submitted an affidavit stating that the home is modular.  At trial, Mr. Scharphorn testified: "There is no opinion.  There is no doubt.  It's a modular home."  He further

---

[10] Capitalization altered.

[11] Capitalization altered.

14

testified, "It's just a modular with additions on it."  According to Mr. Scharphorn, these stick-built additions "make[] [the home] more attractive, but it's a modular unit that has had add-ons to dress it up and its very nice."

- Douglas Snell appraised the home and was qualified as an expert witness in the area of residential real estate appraisals.  At trial, when asked what the home is, Mr. Snell testified, "It is a modular house."

And yet the majority, in its application of its own standard, fails even to note, much less take into consideration, these characterizations.[12]

## D.  "CONGENIALITY"

Similarly, this dissent's understanding and conclusion of modularity fully comports with the covenants' stated purpose, whereas the majority's rule of "predominance" accords no apparent regard to this purpose.  The covenants here, as with

---

[12] The majority concludes that because these various characterizations were offered for purposes separate from the interpretation of the covenant, "none of [these] characterizations help us answer the question presented here—when does a home constructed with modular components become a modular home under the restrictive covenants?"  However, that each of these classifications occurred outside the litigative context, in fact, strongly supports the conclusion that the home is indeed modular.  Each of these sources established how the term "modular home" is employed in ordinary custom, practice, and commerce, which is fully reflective of how the term would most reasonably have been employed in the covenant itself.  In other words, these characterizations make pointedly clear that the majority's standard of "predominance" is entirely estranged from the plain and ordinary understanding of what comprises a modular home in the real world in which contracts and covenants operate.  Moreover, while it is correct that none of these characterizations was set forth in supplying legal meaning to the covenant, that is irrelevant because these only could have proceeded in response to litigation.  Thus, it is a strength, not a weakness, of plaintiffs' position that these characterizations preceded the legal dispute over the covenant.  Accordingly, when all these characterizations have been taken into account, each pertaining to some aspect of erecting the home, the most reasonable conclusion can only be that, per common and ordinary usage, it is modular.

many others across Michigan, are expressly intended to "provide for congenial occupancy of the Premises, and for the protection of the value of the Parcels therein . . . ." See *Bloomfield Estates*, 479 Mich at 214. "Congenial" is defined as "**1 :** having the same nature, disposition, or tastes . . . **2 a :** existing or associated together harmoniously **b :** . . . agreeably suited to one's nature, tastes, or outlook . . . ." *Merriam-Webster's Collegiate Dictionary* (11th ed). In expressing their desire for congeniality, the subdivision's residents thereby simply communicated their concern for tranquility and harmony in their neighborhood.[13] That is, they expressed their intention to live within a structurally homogenous neighborhood that was to be spared the presence of discordant or ill-matching homes, a neighborhood in which they could look out their window and be appeased by the structures that surrounded them. There is nothing in the public policy of this state that disfavors such a contractual purpose or that encourages our judiciary to look askance upon such an arrangement. There is nothing in the public policy of this state that ought to give limited regard to the efforts of free people seeking to anticipate

---

[13] The Goyingses argue that the covenant was intended to prevent "cheap" and "ugly" structures. This argument, however, overlooks that the covenant expressly precludes only the erection of modular homes, whether ugly or beautiful, perhaps because the parties did not want their *own* perceptions of beauty or ugliness to be supplanted by those of the judiciary. Possibly, the parties' premise in drafting the covenant may have been that any home that strayed from the restrictions would likely be substandard, unaesthetic, or incompatible, or simply in some manner negatively affect property values. Such speculation is of no matter, however, because the covenant does not forbid substandard, unaesthetic, or incompatible homes; it forbids modular homes. Thus, even operating under the presumption that the parties' intention was to prohibit substandard, unaesthetic, or incompatible homes, the parties decided that an appropriate mechanism by which to accomplish this was to institute a straightforward ban on modular homes.

and thereby to limit what they perceive as the irritants of daily life. And not to be overlooked despite its obviousness, *both* parties here willingly acceded to the commitments set forth by the covenants, presumably because each envisioned some benefit to themselves of residential "congeniality."

What is particularly disturbing about the majority's decision is its disregard for the virtues of "congeniality," both with regard to modular homes and to other forms of property restriction. It is hard to imagine a more straightforward covenant limitation than that in dispute in this case; at least, in this dissent's judgment, it could not be less in doubt that the home in question was erected and stands in violation of the plainest promise to the contrary. The majority both misreads this promise and ignores its purpose. It can easily be imagined that future covenant restrictions may increasingly be disregarded on the basis of the not-unreasonable suspicion that this Court has now found removal to be a disproportionate remedy for even the most egregious breach of covenant. Judicial decisions invariably have consequences. Indeed, concerning specifically modular-home covenants, the majority offers a road map for avoiding even the breach, never mind the remedy itself-- erect or reconstruct a home that is sufficiently decked out with ancillary and disconnected stick-built elements that will place the home within its 49.9% safe harbor of "predominance." The meaning of any real-world sense of the "congeniality" of such a structure is left little more than empty contractual baggage. In the course, one more minor realm of private decision-making is eroded, one more lesser sphere of decision-making by free persons seeking harmony and accord with their neighbors is displaced by the very different priorities of judges and lawyers.

17

Thus, despite their best efforts to "secure unto themselves the development of a uniform and desirable residential area," *Oosterhouse*, 343 Mich at 288, plaintiffs here suffer disappointment in their pursuit of "congeniality," diminution in the value of their covenants, and likely the lessening of property values. Quite certainly, plaintiffs will not be the last of the people of our state who will be similarly disappointed in what they once supposed to be the protective fortresses of their contracts.

## IV. REMEDY

A finding of modularity, however, does not end the discussion concerning the home; we must determine the appropriate remedy for this violation. Because Michigan has long adhered to the policy of enforcing covenants, I agree with the Court of Appeals that the appropriate remedy in this case is the removal of the home.[14]

"[W]hen parties have freely established their mutual rights and obligations through the formation of unambiguous contracts, the law requires this Court to enforce the terms and conditions contained in such contracts . . . ." *Bloomfield Estates*, 479 Mich at 213. "If the construction of the instrument be clear and the breach clear, then it is not a question of damage, but the mere circumstance of the breach of the covenant affords sufficient ground for the court to interfere by injunction." *Oosterhouse*, 343 Mich at 289,

---

[14] This may appear to many to be a disproportionate-- or even a draconian-- remedy. However, the parties were never precluded from amicably agreeing to an alternative remedy, if that had been viewed as mutually tenable. When they chose not to do so, the courts of Michigan are left to enforce the covenant. See *McQuade v Wilcox*, 215 Mich 302, 306; 183 NW 771 (1921) (noting that there are "[n]umerous cases involving [restrictions] and the right to their enforcement" in this Court's caselaw).

quoting *Lord Manners v Johnson* (1875) LR 1 Ch Div 673, 680 (quotation marks omitted).[15] "The matter of damages to plaintiff is immaterial." *Smart Farm Co v Promak*, 257 Mich 684, 685; 241 NW 813 (1932). See also *Austin v Van Horn*, 245 Mich 344, 346; 222 NW 721 (1929); *Longton v Stedman*, 182 Mich 405, 414; 148 NW 738 (1914).

Thus, "we have never hesitated in proper cases to restrain by injunction the invasion of property rights . . . ." *Oosterhouse*, 343 Mich at 287. This is because "courts cannot disregard private contracts and covenants in order to advance a particular social good." *Terrien*, 467 Mich at 70. "[W]e recognize that refusal to enforce a contract is 'contrary to the real justice as between [the parties].' " *Bloomfield Estates*, 479 Mich at 213, quoting *Mitchell v Smith*, 1 Binn 110, 121 (Pa, 1804). Should a court fail to enforce a covenant, "today's exception [will] become[] tomorrow's precedent and the next day's settled usage. Thus the isolated violation may plant the seed of a general practice which may subsequently lead to a finding of abandonment of the [covenant]." *Oosterhouse*, 343 Mich at 289; see also Olson, *The Litigation Explosion: What Happened When America Unleashed the Lawsuit* (New York: Truman Talley Books, 1991), p 218 ("If

---

[15] See also *Doherty v Allman* (1878) LR 3 App Cas 709, 720 ("If parties, for valuable consideration, with their eyes open, contract that a particular thing shall not be done, all that a court of equity has to do is to say by way of injunction that which the parties have already said by way of covenant, that the thing shall not be done; and in such case the injunction does nothing more than give the sanction of the process of the court to that which already is the contract between the parties. It is not, then, a question of convenience or inconvenience, or of the amount of damage or injury—it is the specific performance, by the court, of that negative bargain which the parties have made, with their eyes open, between themselves.").

courts no longer thought it as important as they once did that people live up to their solemn promises . . . people would themselves come to attach less importance to choice and agreement as sources of rights.").

We enforce covenants because "[u]ndergirding [the] right to restrict uses of property is, of course, the central vehicle for that restriction: the freedom of contract, which is . . . deeply entrenched in the common law of Michigan." *Terrien*, 467 Mich at 71 n 19.

> The notion, that free men and women may reach agreements regarding their affairs without government interference and that courts will enforce those agreements, is ancient and irrefutable. It draws strength from common-law roots and can be seen in our fundamental charter, the United States Constitution, where government is forbidden from impairing the contracts of citizens, art I, § 10, cl 1. [*Wilkie v Auto-Owners Ins Co*, 469 Mich 41, 52; 664 NW2d 776 (2003).]

" 'The principle of freedom of contract is rooted in the notion that it is in the public interest to recognize that individuals have broad powers to order their own affairs.' " 1 Restatement Property, 3d, Servitudes, § 3.1, comment *a*, p 347, quoting 2 Restatement Contracts, 2d, Introductory Note, pp 2-3.[16]

---

[16] The importance of contract in our society cannot be understated. "The law of contract occupies a special place in American law . . . ." Friedman, *A History of American Law* (New York: Simon & Schuster, 1973), p 532. "[F]ree contract [is] a pillar holding up the palace of ordered liberty[.]" *Id*. The ability of each individual to enter into a free and voluntary agreement, regardless of his or her race, creed, religion, or gender, is inherent to this state's foundational adherence to "equal opportunity and justice to all." MCL 2.29. Indeed, liberal societies such as ours exist as a result of the "movement *from Status to Contract*," Maine, *Ancient Law* (London: John Murray, 1861), p 170, by which the dispositive influence of castes and classes came to be replaced over time by the free interaction of citizens. Societies came to realize that the ideal way to "organize[] social relations [is] through free voluntary agreement" by persons "pursuing their own

20

Accordingly, given that the Goyingses violated the covenant in this case by erecting a modular home, we are left only to enforce the covenant and then to remedy the violation. Indeed, "in the absence of countervailing public policy, it is not the function of the courts to strike down private property agreements and to readjust those property rights in accordance with what seems reasonable . . . ." *Oosterhouse*, 343 Mich at 289-290.[17] Rather, we must act in accordance with the intentions of the parties as evidenced by their covenant, which proposition lies at the heart of the rule of law. Here, the parties intended to provide for "congenial" occupancy by imposing certain restrictions upon the construction of a home within a subdivision, a principal one of which was to forbid modular homes, and the Goyingses acted contrary to these intentions. Because it is the parties' land and property interests, it does not matter *why* they agreed to such a restriction, but simply that they did. "We may not understand why property owners want certain obligations to run with the land, but as it is *their* land, not ours, some very strong reasons should be advanced before [courts'] intentions are allowed to control." Epstein, *Notice and Freedom of Contract in the Law of Servitudes*, 55 S Cal L Rev 1353, 1359 (1982).

---

ends . . . ." *A History of American Law*, p 532. Thus, " 'parties may contract as they wish, and courts will enforce their agreements without passing on their substance.' " 1 Restatement Property, 3d, Servitudes, § 3.1, comment *a*, p 347, quoting 2 Restatement Contracts, 2d, Introductory Note, p 2. However, when a court fails to reasonably adhere to a contract that is the result of a free and voluntary transaction between individuals, a foundational underpinning of our law and society is eroded.

[17] Of course, a judge may not define public policy on the basis of his or her predilections but rather must adhere to "policies that, in fact, have been adopted by the public through our various legal processes, and are reflected in our state and federal constitutions, our statutes, and the common law." *Terrien*, 467 Mich at 66-67.

Given the circumstances of the instant case, the only effective remedy is the removal or dismantling of the home.[18]  This is not an instance in which a violation can be otherwise remedied by a "quick fix" such as repainting or reshingling the home to conform with exterior appearance requirements or reconfiguring a fence or porch to avoid encroachment upon boundary lines.  Rather, as already discussed, the Goyingses' home, considered as a whole, is modular because its core is modular.  That is, the home cannot be made nonmodular absent removal; a home cannot stand without its core.  Accordingly, I agree with the Court of Appeals that no other remedy will more reasonably suffice and that the "only solution [is] to grant injunctive relief and order that the non-conforming home be removed." *Thiel*, unpub op at 6.

While this remedy might appear to some as disproportionate or unfair, removal is, in fact, entirely equitable.  In requiring the removal of a building that violated covenants which established boundary lines and forbade more than one family residence on a parcel, this Court adopted the following reasoning of the Supreme Judicial Court of Massachusetts:

---

[18] While it not something done every day (most likely because covenants are not so blatantly breached every day), it is not without precedent that this Court has ordered the removal of an otherwise valuable building that violates a covenant or easement.  See, e.g., *Nechman v Supplee*, 236 Mich 116, 119; 210 NW 323 (1926) (ordering the removal of a four-family flat in a subdivision that prohibited any building other than single-family residences); *Smith v Byrne*, 208 Mich 104, 108-109; 175 NW 138 (1919) (affirming an order requiring the removal of a rental garage on a parcel intended for a single private residence); *McIlhinny v Village of Trenton*, 148 Mich 380, 383; 111 NW 1083 (1907) (ordering the removal of an electric lighting plant that a village improperly constructed in the center of a public street).

"It is strongly urged that a mandatory injunction ought not to issue, for the reason that it would operate oppressively and inequitably, and impose on the defendant a loss disproportionate to the good it can accomplish, and that the plaintiffs ought to be relegated to financial compensation by way of damages. This remedy is a drastic one, and ought to be applied with caution, but in cases proper for its exercise, it ought not to be withheld merely for the reason that it will cause pecuniary loss. It has been found that the defendant, with full knowledge of the restrictions, 'deliberately attempted' to override them, and thus deprive the district of the character given it by the restrictions. He took his chances as to the effect of his conduct with eyes open to the results which might ensue. It has been the practice of courts to issue mandatory injunctions upon similar facts. (Citing cases.) Intrenchment behind considerable expenditures of money cannot shield premediated efforts to evade or circumvent legal obligations from the salutary remedies of equity." [*Nechman v Supplee*, 236 Mich 116, 124-125; 210 NW 323 (1926), quoting *Stewart v Finkelstone*, 206 Mass 28, 38; 92 NE 37 (1910).]

Here, the Goyingses were not only fully aware that their covenant prohibited the erection of modular homes, but they were also fully aware that their home in particular might run afoul of the covenant. Indeed, they contracted for a specifically described "modular" home and were then approached by plaintiffs, who immediately objected to the construction of the home on the basis of its modularity. Nonetheless, the Goyingses, as acknowledged even by the majority, "brushed off" plaintiffs' objections. See *Oliver v Williams*, 221 Mich 471, 475; 191 NW 34 (1922) ("Defendants knew, when they purchased their lots, of the building restriction thereon and, while they accepted the same, they evidently did so with the mental reservation that they would not abide thereby if they could avoid the obligation."). But a party may not act in "bald defiance of [a]

23

restriction" and thereafter complain that a result would somehow be inequitable. *Michiana Shores Estates, Inc v Robbins*, 290 Mich 384, 388; 287 NW 547 (1939).[19]

Moreover, while this Court has on another occasion recognized specific equitable exceptions to the enforcement of a covenant, these exceptions are absent in this case. In *Cooper*, 349 Mich at 530, quoting 26 CJS (1956), Deeds, § 171, we stated:

> As equitable exceptions to the general rule that the courts will enforce valid restrictions by injunction we find these: (a) Technical violations and absence of substantial injury; (b) Changed conditions; [and] (c) Limitations and laches.

However, in *Cooper*, we neither defined nor expounded upon what would constitute a "[t]echnical violation[]" or the "absence of substantial injury,"[20] the only one of these exceptions even conceivably pertinent in the present case,[21] and we declined to invoke

---

[19] This is not, however, to say that the Goyingses acted out of malice or ill will. See *Oosterhouse*, 343 Mich at 285 ("The violation was apparently deliberate. But it was not malevolent, and it was conceived in no spirit of deliberate harm to his neighbors' rights."). By all accounts, the Goyingses sought to build their dream home at significant expense. Nonetheless, they did so by *knowingly* ignoring the limitations imposed upon them by their own promises and should, as a fair result, bear the consequences so as not to burden the substantial interests of their neighbors.

[20] The Court of Appeals helpfully identified a definition of the exception in *Webb v Smith (After Second Remand)*, 224 Mich App 203, 212; 568 NW2d 378 (1997): "a technical violation of a negative covenant [is] a 'slight deviation' or a violation that 'can in no wise, we think, add to or take from the objects and purposes of the general scheme of development . . . .' " (Quotation marks and citation omitted.)

[21] The Goyingses have not alleged that the subdivision in any way has undergone changed conditions since the adoption of the covenants, and the trial court concluded that neither waiver nor equitable estoppel prevented plaintiffs from bringing suit, a decision the Goyingses did not appeal and hardly could have successfully appealed in light of the promptness of plaintiffs' legal challenge.

24

the exception, concluding that the defendants' "conversion of a large portion of a residential subdivision to business in direct violation of a contrary covenant undoubtedly affects every home therein." *Cooper*, 349 Mich at 530.

But *Cooper* has never since been cited by this Court for its assertion of a technical-violation exception to the enforcement of a covenant. Indeed, it stands out as a distinct outlier in this Court's jurisprudence, appearing to be at odds with this Court's repeated emphasis, both before and after *Cooper*, that the mere occurrence of a breach may necessitate a judicial response, regardless of the extent of the harm.[22] See, e.g., *Terrien*, 467 Mich at 65; *Oosterhouse*, 343 Mich at 289; *Smart Farm Co*, 257 Mich at 685; *Austin*, 245 Mich at 346; *Longton*, 182 Mich at 414. That is, the notion that an undisputed violation may be excused or ignored by the judiciary because it comprises only a slight deviation from what is required by the covenant is inconsistent with the Court's myriad holdings that no deviation should be deemed immaterial.[23] Thus, I

---

[22] Obviously, the nature of the *relief* afforded may vary substantially depending upon the nature and magnitude of the violation, perhaps only rarely requiring the broad relief that I believe is required in the case.

[23] This Court has engaged in several discussions regarding "minor" or "trivial" violations. See, e.g., *Jeffery v Lathrup*, 363 Mich 15, 22; 108 NW2d 827 (1961); *Stark v Robar*, 339 Mich 145, 154; 63 NW2d 606 (1954) ("We need not cite any authority for the proposition that minor infractions of restrictions by other lot owners do not preclude this appellee from objecting to the major violation of a business structure on lots restricted for residential purposes."); *Knorr v Hazen*, 292 Mich 119, 123; 290 NW 351 (1940); *Boston-Edison Protective Ass'n v Goodlove*, 248 Mich 625, 629-630; 227 NW 772 (1929) ("Plaintiffs are not estopped from preventing a most flagrant violation of the restrictions on account of their theretofore failure to stop a slight deviation from the strict letter of such restrictions."); *Nechman*, 236 Mich at 120; *Signaigo v Begun*, 234 Mich 246, 249; 207 NW 799 (1926); *Oliver*, 221 Mich at 476; 34 Am Jur POF3d 339, 370, § 16 ("Trivial violations of a restrictive covenant do not result in the loss of a right to enforce the

question whether the technical-violation exception of *Cooper* remains good law, and was ever more than an outlier, in light of our contrary decisions in the same regard.

However, even to the extent that the technical-violation exception remains viable within our jurisprudence, the present violation was anything but technical. <u>First</u>, our caselaw continues to mandate that the "technicality" of the violation cannot hinge upon the lack of damages; thus, it is of no consequence that plaintiffs have not suffered easily measurable damages, especially those pertaining to lack of "congenial" occupancy. <u>Second</u>, a violation can hardly be regarded as technical when neighboring plaintiffs have promptly and steadfastly pursued litigation in an effort to protect what they deem to be an infringement upon the property rights they enjoy in the covenant, and this Court is not empowered to engage in its own assessment of the value of these rights in an effort "to advance a particular social good." *Terrien*, 467 Mich at 70. <u>Third</u>, the present violation is permanent and ongoing, pervading the entire use of the property in question; *to wit*, the parcel here was intended for single-family residential use of a stick-built home, and by

---

covenant by injunction, and acquiescence in violations of a restrictive covenant which are immaterial will not preclude restraining violations which would so operate as to cause the property owner damage."). These discussions, however, are confined to considerations of the *waiver* of the right to enforce a covenant. In this context, a court's consideration of triviality seems fully prudent because in such instances the parties have already concluded that the initial violation was trivial. Indeed, when a defendant has previously overlooked a violation because he deemed it unworthy of enforcement, he should not be allowed to avoid his *own* violation on account of the previously ignored and trivial violation. By contrast, when a plaintiff has timely filed suit concerning a defendant's alleged violation of a covenant, that violation cannot be deemed technical or else the plaintiff presumably would not have filed the action. In such instances, this Court must adhere to the policy of enforcing covenants, which "has been expressly held to be the common law of this state." *Terrien*, 467 Mich at 71 n 19.

26

erecting a modular home the Goyingses have substantially tainted for neighbors the residential use of their own property until the home is removed. <u>Fourth</u>, the violation is in no fashion a "slight deviation," as it directly undermines the covenants' express and fundamental command and consequently the parties' intentions of maintaining "congenial" occupancy within the subdivision. Accordingly, the violation "undoubtedly affects every home therein." *Cooper*, 349 Mich at 530. Rather than being "technical" in any comprehensible sense of that term, the Goyingses' disregard of the covenant's obligations is both blatant and substantial, cutting to the core of the covenant.

## V. RESPONSE TO THE CONCURRENCE

The concurrence concludes "that the decision of whether to enforce a restrictive covenant by injunction is a matter left to the discretion of the trial court, sitting in equity" and that a trial court must "exercise its discretion in determining an equitable remedy." "But courts have no power to create equities contrary to law." *Hendricks v Toole*, 29 Mich 340, 343 (1874). Instead, there must be a *standard*-- a legal standard-- derived from the covenant itself and from the nature of the violation of that covenant that ultimately guides the determination of an appropriate remedy. *Oosterhouse*, 343 Mich at 289 ("Equity acts . . . because of the nature of the violation itself."). That is, in considering both the violation and the remedy, there must be a standard for decision-making that is grounded in the covenant itself. Consideration of some vague formulation of "equity" does not allow the judiciary to look to its own conscience and to substitute that conscience for the decisions of the parties who, by contract, have established their own "law" to be applied in the event of a future dispute. While the judiciary does indeed

27

have some necessary element of discretion to choose among remedies that afford relief for a contract breach, the ultimate standard, the lodestar, for exercising that discretion must be the covenant itself.  Is this the standard by which the concurring justice would measure "equity"?  If not, what would his standard be?  Courts do not have a rootless or limitless commission to do "equity," but courts must do even "equity" within the confines of the law.  Specifically with regard to the instant case, *both* the fact of the violation and the range of appropriate remedies for that violation are defined by the terms of the covenants-- have the covenants been breached as a result of defendants' conduct, and if so, how can plaintiffs' affected interests be most reasonably and fully redressed?  The weight and priority of these interests is determined in accordance with the covenants and not in accordance with the judge's own abstract understanding of "equity."  Thus, the concurrence is in error when it asserts that this dissent "summarily" concludes that removal is the required remedy; rather, I reached this conclusion only after having considered the terms of the covenant and having discerned no alternative course that would fully redress the interests of plaintiffs.  But the concurrence merely decries that abstract considerations of "equity" must somehow predominate over the terms of the contract, supplying no particular standard by which to measure what such "equity" would require and affording no particular guidance for the lower courts to whom it would remand for this determination.[24]

---

[24] Quite imprecisely, the concurring justice asserts that I possess an "evident distaste" for the judicial exercise of discretion.  Better put, I possess an "evident distaste" for the type of *standardless* discretion that the concurring justice hails.  And even better put still, I

Rather than act in accordance with the covenant, the concurrence "imagine[s] that there is some vague equity" that should entirely control a court's decision. *Hendricks*, 29 Mich at 343. But the concurrence fails to apprehend that its position would

> accord the judiciary the power to examine the wisdom of private contracts in order to enforce only those contracts it deems prudent. However, it is not 'the function of the courts to strike down private property agreements and to readjust those property rights in accordance with what seems reasonable upon a detached judicial view.' Rather, absent some specific basis for finding them unlawful, courts cannot disregard private contracts and covenants in order to advance a particular social good. [*Terrien*, 467 Mich at 69-70, quoting *Oosterhouse*, 343 Mich at 289-290.]

For "the duty of the judiciary is to assert what the law 'is,' not what it 'ought' to be." *Terrien*, 467 Mich at 66. "If a deed restriction is unambiguous, we will enforce that deed restriction as written unless the restriction contravenes law or public policy, or has been waived by acquiescence to prior violations, because enforcement of such restrictions grants the people of Michigan the freedom 'freely to arrange their affairs' by the formation of contracts to determine the use of land." *Bloomfield Estates*, 479 Mich at 214 (citation omitted). Thus, equity is certainly relevant with regard to crafting the remedy for a violation of a covenant and addressing circumstances such as waiver, laches, changed circumstances, and unclean hands. *Id.*; *Taylor Avenue Improvement Ass'n v Detroit Trust Co*, 283 Mich 304, 309; 278 NW 75 (1938); *Evergreen Village Civic Ass'n v Oakborn, Inc*, 327 Mich 161, 166; 41 NW2d 509 (1950) (opinion by SHARPE, J.). But when such circumstances do not exist, courts are left to enforce the

---

possess an "evident distaste" that in exercising this standardless discretion, freely made contractual judgments entered into within this state can be so thoroughly disregarded.

29

covenant and fashion a remedy that resolves the violation, which in this case, as properly ascertained by the Court of Appeals, is removal of the home.

In the end, it is both ironic and telling that while the *concurrence* would substitute "equity" for the law, the *majority*, with whom the concurring justice joins, would hail as the virtue of its own test that, unlike this dissent, resolution of the present dispute would not be "left to a reviewing judge's whims." See note 9 of this opinion.

## VI. CONCLUSION

"[W]hen parties have freely established their mutual rights and obligations through the formation of unambiguous contracts, the law requires this Court to enforce the terms and conditions contained in such contracts . . . ." *Bloomfield Estates*, 479 Mich at 213. When we fail to do so, a foundational institution of our rule of law is undermined. *Terrien*, 467 Mich at 70. On the basis of a review of common and ordinary understandings of what comprises a modular home-- in particular the unanimous characterizations of professionals familiar with such homes-- see Part III(C) of this opinion, it is clear that the Goyingses have erected a modular home in a subdivision in which such erection was expressly prohibited by covenant and thus have breached a promise made in that covenant. As a result, the "congenial" enjoyment of plaintiffs' property rights in those covenants was substantially undermined. There being no contrary equitable considerations in the Goyingses' favor, I would affirm the Court of Appeals' determination that the home be removed. I thus respectfully dissent.

Stephen J. Markman
Brian K. Zahra

30